952 A.2d 1060

RONALD JAMGOCHIAN, APPELLANT–RÈSPONDENT,
v. NEW JERSEY STATE PAROLE BOARD,
RESPONDENT–APPELLANT.

Argued April 8, 2008—Decided August 6, 2008.

*Lisa A. Puglisi,* Deputy Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

*Joseph S. Murphy* argued the cause for respondent.

. Justice ALBIN delivered the opinion of the Court.

˙ Ronald Jamgochian was twice convicted of sexually assaulting young women after luring them to his "photography studio" with offers of modeling work. After serving the prison term on his most recent conviction, Jamgochian was released subject to community supervision for life. Thereafter, Jamgochian propositioned a seventeen-year-old waitress with an unspecified job opportunity while telling her to keep their conversations secret. She became suspicious and reported the matter to the authorities. In response, the Parole Board imposed a curfew without any expiration date, confining Jamgochian to his home between the hours of 8:00 p.m. and 7:00 a.m. The curfew lasted sixteen months.

Before and after imposing the curfew, the Parole Board denied Jamgochian's demand not only for an adversarial hearing, but any type of hearing. The Appellate Division concluded that the Parole Board violated Jamgochian's right to due process of law by imposing and then continuing the curfew without providing him with sufficient notice and an adequate opportunity to be heard. We affirm, although for slightly different reasons than the Appellate Division. We now hold that, despite Jamgochian's status as a community-supervised-for-life offender, the Parole Board was obliged to afford him the due process protections of notice and an opportunity to be heard, and that those minimal requirements were not met in this case.

I.

A.

In 1979, Jamgochian was convicted of committing a number of crimes, including kidnapping and aiding and abetting rape and

sodomy, and sentenced to twelve years in New Jersey State Prison. The crimes involved Jamgochian first luring a young woman to his home under the pretense of offering her a modeling job and then forcing her to perform simulated sexual acts while his confederates took photographs.

In 1998, Jamgochian pled guilty to second-degree sexual assault, *N.J.S.A.* 2C:14–2(c)(1), and second-degree possession of a weapon by a convicted person, *N.J.S.A.* 2C:39–7(b)(1). The sexual crime involved Jamgochian again luring a young woman with the false promise of modeling work—posing for the cover of a romance novel. While at his "studio," Jamgochian persuaded the young woman that the photography shoot required that he bind her to a bed with chains and leather straps. After the woman was rendered helpless, Jamgochian forced her to perform oral sex and to simulate other sexual acts while he videotaped the scenes. Jamgochian was sentenced to a four-year prison term for sexual assault and a concurrent four-year term for the weapon offense. Jamgochian was also ordered to comply with the requirements of Megan's Law, *N.J.S.A.* 2C:7–2, and community supervision for life, *N.J.S.A.* 2C:43–6.4 (prior to 2003 amendment).[1]

The day before his release from prison in October 2001, Jamgochian signed a two-page form, acknowledging that he was subject to "the special sentence of community supervision for life" and required to abide by twenty-two "general conditions."[2]

---

[1] After Jamgochian's convictions in 1998, the Legislature amended the community-supervision-for-life statute. *See L.* 2003, *c.* 267, § 1. The Legislature changed the title of the "special sentence" from "community supervision for life" to "parole supervision for life," and added that

> [p]ersons serving a special sentence of parole supervision for life shall remain in the legal custody of the Commissioner of Corrections, shall be supervised by the Division of Parole of the State Parole Board, [and] shall be subject to the provisions and conditions set forth in [*N.J.S.A.* 30:4–123.51b, *N.J.S.A.* 30:4–123.59 to –123.63, and *N.J.S.A.* 30:4–123.65].
>
> [*Ibid.* (codified at *N.J.S.A.* 2C:43–6.4).]

[2] The form that Jamgochian signed contained the twenty-two general conditions found in the then-present version of *N.J.A.C.* 10A:71–6.11(b). The current

Among other things, those conditions required Jamgochian to obtain permission from his parole officer before changing his address, leaving the state, or accepting employment; to submit to drug or alcohol testing, or any medical or psychological examination ordered by his parole officer; and "to comply with any curfew established" and "any other reasonable instruction or directive given by [his] parole officer." No curfew was imposed at the time of his release.

On April 14, 2005, three-and-one-half years after Jamgochian's release, a seventeen-year-old waitress at a diner (Sarah) [3] reported to the Rockaway Township Police Department that a customer known to her as Ron had contacted her on her cell phone and offered to "help" her financially, remarking that she could earn $300 working only two hours a week. The customer—later identified as Ronald Jamgochian—told her that he did not want to discuss the details over the telephone and made her promise not to tell anyone about the conversation. He also attempted to arrange a meeting with her that weekend. Earlier that same day, Jamgochian had approached Sarah at the diner and asked if they "could have a conversation that no one would find out about." Both at the diner and over the telephone, Sarah let Jamgochian know that she "was uncomfortable with the situation," particularly his repeated requests that she not tell anyone about their conversations. The next day, Sarah's mother learned from the owner of the diner that Jamgochian "had been in jail for 'trouble with young girls.'" Sarah then contacted the police.

On April 15, 2005, Jamgochian's District Parole Supervisor imposed two special conditions on his supervised status, directing that Jamgochian have no contact in any form with Sarah and that

---

version of *N.J.A.C.* 10A:71–6.11(b) contains twenty-one conditions, including the potential curfew condition, but some of the other conditions have been changed since 2001.

[3] The use of this pseudonym is for the purpose of guarding the privacy of the young woman who reported this matter.

he comply with a curfew at his "residence between the hours of 8:00 pm and 7:00 am daily." Three days later, the District Parole Supervisor imposed an additional special condition, requiring that Jamgochian "participate in, and successfully complete an appropriate mental health-counseling program" for sex offenders. The District Parole Supervisor gave substantially the same written reasons for imposing all three special conditions:

> Jamgochian contacted [Sarah] after obtaining her personal information from an unknown source and attempted to arrange a meeting to discuss employment. As described by Jamgochian, this employment would be for a short time period and pay an inordinately large amount of money. Jamgochian has a history of sexual offenses involving victimization of women he lured by offering them modeling work. [Jamgochian's behavior] towards [Sarah] fits his identified offense cycle/modus operandi. This Special Condition will curtail Jamgochian's ability to commit further acts of victimization.

Approximately two weeks later, Jamgochian, through his attorney, wrote to the Chairman of the New Jersey State Parole Board, objecting to the imposition of the special conditions because they were not approved by a panel of the Parole Board, as required by N.J.A.C. 10A:71–6.11(l), and because they were unwarranted and unreasonable. Jamgochian did not deny talking to the waitress at the diner that he often patronized, but suggested that the Parole Board had not shown that he had made a specific or unlawful offer of employment to the waitress. Portraying himself as the victim of harassment by his parole officer, Jamgochian claimed that the charges were the "product of a [parole officer] operating beyond the bounds of ethics." In a certification attached to his attorney's letter, Jamgochian noted that he had told his parole officer that "this was all bullshit. That even if I made a call, what would that have to do with a curfew?" Jamgochian agreed to stay away from the diner.

On May 4, 2005, a two-member Parole Board panel affirmed the imposition of the three special conditions, stating that Jamgochian's conduct was "alarmingly similar" to the steps he took leading to his previous crimes. In particular, the Board panel explained that the 8:00 p.m. to 7:00 a.m. curfew would "allow the Division of Parole to better monitor [his] whereabouts and activities and,

thus, [would] seek to lessen the likelihood of [his] return to criminal activity." Eight weeks later, the Parole Board forwarded to Jamgochian's attorney the "reports and information" relied on by the panel in rendering its decision.

In a letter dated November 4, 2005, Jamgochian appealed to the full Parole Board, claiming that the imposition of the three special conditions violated his federal and state constitutional rights to due process and to confront the witnesses against him. Specifically, he claimed that before the special conditions were imposed, he was entitled to a hearing at which he could cross-examine witnesses and present a defense and that he was entitled to review the evidence against him in advance of the hearing. He also complained that the Board panel's decision "was based upon reports and writings that were not sworn to and were full of hearsay and vague accusations." According to Jamgochian, the State had no right to imprison him every night for eleven hours when he had not been accused of a crime or parole violation.

On February 24, 2006, by letter, the full Parole Board concurred with the panel's decision to impose the three special conditions, finding that the conditions would "lessen the likelihood of Mr. Jamgochian returning to criminal activity." The Board maintained that the District Parole Supervisor was empowered by *N.J.A.C.* 10A:71–6.11(*l*) to impose the special conditions if, in his opinion, the "conditions would reduce the likelihood of recurrence of criminal behavior." [4] *Ibid.* The Board noted, as well, that the panel was not required "to conduct a hearing or provide [Jamgochian] with documentation prior to affirming the imposition of the special conditions for community supervision for life."

---

[4] *N.J.A.C.* 10A:71–6.11(*l*) provides:

Additional special conditions may be imposed by the District Parole Supervisor, an Assistant District Parole Supervisor or the designated representative of the District Parole Supervisor when it is the opinion that such conditions would reduce the likelihood of recurrence of criminal behavior. The offender and the Board shall be given written notice upon the imposition of such conditions.

Jamgochian then filed an appeal challenging only the curfew. On August 28, 2006, while the appeal was pending, the Board placed the curfew in abeyance.

### B.

A divided three-judge panel of the Appellate Division concluded that Jamgochian was denied due process because the governing regulation, *N.J.A.C.* 10A:71–6.11(*l*), provided "an inadequate procedural framework" for the imposition of the curfew and denied him "a meaningful opportunity to be heard." *Jamgochian v. N.J. State Parole Bd.,* 394 *N.J.Super.* 517, 522, 928 *A.*2d 1 (App.Div. 2007). Writing for the majority, Judge Fisher first found that the lifting of the curfew did not render the appeal moot because the "appeal raises issues of substantial importance that are likely to recur but evade review." *Id.* at 529, 928 *A.*2d 1.

The majority next concluded that because the seven-day-a-week, eleven-hour curfew deprived Jamgochian of a significant liberty interest, due process under both the Federal and State Constitutions "mandates more extensive procedural rights than presently permitted by *N.J.A.C.* 10A:71–6.11(*l*)." *Id.* at 538, 928 *A.*2d 1. The majority acknowledged that the Parole Board has the authority to impose a curfew on a supervised offender whose conduct poses a threat to the public. *Id.* at 530, 928 *A.*2d 1. That authority, however, cannot be "invoked arbitrarily," and a curfew has to "bear[ ] a reasonable relationship to the rehabilitation of the individual, the protection of society or the prevention of recidivistic behavior." *Id.* at 530–31, 928 *A.*2d 1.

The majority noted that, under *N.J.A.C.* 10A:71–6.11(*l* ), before the parole panel imposes the special condition of a curfew, a supervised offender is not permitted "to view the evidence . . . to confront or call witnesses; or to offer relevant evidence." *Jamgochian, supra,* 394 *N.J.Super.* at 532, 928 *A.*2d 1. In addition, a curfew could be imposed based on "the rankest of hearsay" without any "input or participation" by the person whose liberty interest is impinged. *Ibid.*

In determining whether that procedural structure complied with principles of due process, the majority applied the three-factor test set forth in *Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976), which balances the right at stake, the potential for an erroneous deprivation of the right through the procedures used, and the government's interest. *Jamgochian, supra,* 394 *N.J.Super.* at 534, 928 *A.*2d 1. The majority concluded that the eleven-hour curfew in this case "represents a significant burden on [Jamgochian's] liberty interests" and that "the one-sided nature of the proceedings" before the parole panel, which precluded any meaningful participation by Jamgochian or his counsel, "greatly increased" the likelihood of an erroneous deprivation of his liberty. *Id.* at 534–36, 928 *A.*2d 1. That Jamgochian submitted factual and legal arguments to the full Parole Board after the two-member panel's decision but before the full Board rendered its decision "d[id] not alter [the majority's] view that Jamgochian was deprived of due process." *Id.* at 540 n. 4, 928 *A.*2d 1.[5]

Although the majority was convinced that the Board denied Jamgochian due process, in considering the third *Mathews* factor—the administrative and fiscal burden that would be borne by the Board by providing notice and an opportunity to be heard to supervised offenders—the majority declined "to define the scope of a constitutional procedural framework," *id.* at 540, 928 *A.*2d 1, and instead left "this question for the Board's consideration in the first instance," *id.* at 541, 928 *A.*2d 1. The majority, however, strongly suggested that due process may require the right to discovery materials in advance of a hearing, the right to confront and call witnesses, and the right to counsel. *Id.* at 535–41, 545–50, 928 *A.*2d 1. The majority would have reached the same conclusion

---

[5] The majority recognized that there may be the need in appropriate circumstances for the emergent imposition of a curfew before a hearing can be conducted, and that in such circumstances "a post-deprivation hearing [might] satisfy the requirements of due process." *Jamgochian, supra,* 394 *N.J.Super.* at 539, 928 *A.*2d 1.

based on the doctrine of fundamental fairness. *Id.* at 545, 928 *A.*2d 1 (citing *Doe v. Poritz*, 142 *N.J.* 1, 108, 662 *A.*2d 367 (1995)). The majority remanded for further proceedings. *Id.* at 550, 928 *A.*2d 1.

In dissent, Judge Wefing concluded that Jamgochian was not entitled to a hearing because he did not directly deny Sarah's allegations. *Id.* at 555, 928 *A.*2d 1 (Wefing, P.J.A.D., dissenting). Jamgochian's general remark to his parole officer that " 'this was all bullshit,' " in Judge Wefing's view, did not constitute a denial. *Id.* at 553, 555, 928 *A.*2d 1. Judge Wefing did not "consider it unfair to expect [Jamgochian] to set forth an explicit denial of the charges as opposed to what is, at best, an ambiguous emotional reaction." *Id.* at 555, 928 *A.*2d 1. On that basis, Jamgochian "received the process to which he was due" and therefore she would have "affirm[ed] the action of the Parole Board." *Id.* at 557, 928 *A.*2d 1.

Judge Wefing was critical of the majority's suggestion that hearsay evidence should not be relied on by the Parole Board in determining whether to impose a curfew as a condition of community supervision for life, and "[i]n [her] judgment, the right of confrontation and cross-examination should not be viewed as a necessary and integral part of all [such] proceedings." *Id.* at 554, 928 *A.*2d 1. Judge Wefing believed that "claims of entitlement to a hearing are susceptible to . . . case-by-case approval," and that a prerequisite to a hearing is that a supervised offender make a "timely and colorable claim" denying the charges leading to special conditions. *Id.* at 556, 928 *A.*2d 1 (quotation marks omitted).

The Board appealed as of right, *R.* 2:2–1(a)(2), and also filed a petition for certification, which we granted. 193 *N.J.* 221, 936 *A.*2d 968 (2007).[6]

---

[6] It should be noted that the Board did not raise as one of the grounds for certification the argument that Jamgochian's appeal before the Appellate Division was moot because the curfew had been lifted.

## II.

The Parole Board asserts that the Appellate Division wrongly applied the *Mathews* factors in concluding that due process requires an adversarial-type proceeding before a curfew can be imposed on a community-supervised-for-life offender. The Board argues that Jamgochian's "rights as a 'free man' " were curtailed when he was convicted of sexual assault and sentenced to community supervision for life, and thus a parole condition, such as a curfew, did not amount to a "further curtailment of a liberty interest." Therefore, Jamgochian was not entitled to "the full panoply of rights due to a non-offender." The Board considers it of no importance that the curfew condition was imposed three-and-one-half years after Jamgochian completed his sentence inasmuch as he is subject to lifetime supervision.

The Board downplays the potential for an erroneous outcome as a result of its non-adversarial procedures, emphasizing, as did Judge Wefing, that Jamgochian did not deny the truth of Sarah's statements. If he had, the Board contends that it could have obtained a "sworn certification from [Sarah], telephone records, or other proof of Jamgochian's inappropriate [conduct]." The Board stresses that permitting supervised offenders like Jamgochian the right to cross-examine a private citizen, such as Sarah, would make it less likely that complaining witnesses would come forward in the future. According to the Board, the current procedures are flexible enough to address particular needs. A curfew is reviewed every six months to determine if there is a continuing need for it; it is not imposed if it will interfere with an evening job or school; and, it may be vacated on a showing of good cause. Indeed, the Board points out that it lifted Jamgochian's curfew "because he had abided by it for a sufficient period of time, and because his work obligations rendered the curfew inappropriate."

Last, the Board expresses concern that the administrative burden might be devastating if the appellate panel's decision were construed to apply not only to the 3,300 community-supervised-for-life offenders who face a curfew, but to all parolees. In short,

the Board submits that the appellate panel's ruling "threatens to undermine the effectiveness of the Board's operations because its far-reaching call for adversarial proceedings in the parole supervision context will shift the focus from offender rehabilitation to administrative contests over offender behavior."

. In contrast, and unsurprisingly, Jamgochian urges this Court to affirm the Appellate Division. Jamgochian asserts that an eleven-hour home confinement every day of the week for sixteen months, classified as a curfew, implicates a significant liberty interest. He argues that in measuring deprivation of liberty as the loss of freedom of movement, there is no real distinction between imprisonment in one's home and imprisonment in a correctional facility, weekend detention in jail, or serving time in a halfway house. Because he completed his criminal sentence and was not in the custody of the Parole Board, but rather at liberty in the community, subject to supervision, Jamgochian reasons that the Parole Board had no authority to impose a curfew "without [giving him] the full panoply of rights to which a citizen is entitled." In essence, Jamgochian submits that, as a community-supervised-for-life offender, he was denied basic due process rights—the right to a hearing with the assistance of counsel, the right to discovery in advance of the hearing, the right to cross-examine and call witnesses, and the right to a recording of the proceedings.

## III.

The central issue in this case is the process that is due to a community-supervised-for-life offender prior to the imposition of a curfew. Before addressing that issue, we first discuss the meaning and scope of community supervision for life.

When he was sentenced for the 1998 sexual assault, Jamgochian was automatically subject to a "special sentence of community supervision for life," beginning at the completion of his four-year term of imprisonment. *N.J.S.A.* 2C:43–6.4(a) and (b) (prior to 2003 amendment). Community supervision for life was "designed to protect the public from recidivism by defendants convicted of

serious sexual offenses." *Sanchez v. N.J. State Parole Bd.,* 368 *N.J.Super.* 181, 184, 845 *A.*2d 687 (App.Div.), *certif. granted,* 182 *N.J.* 140, 861 *A.*2d 845 (2004), *appeal dismissed,* 187 *N.J.* 487, 901 *A.*2d 951 (2006); *see Doe, supra,* 142 *N.J.* at 15 n. 1, 662 *A.*2d 367 (noting that "the relative recidivism rate of sex offenders is high compared to other offenders; treatment success of sex offenders exhibiting repetitive and compulsive characteristics is low"); *see also McKune v. Lile,* 536 *U.S.* 24, 33, 122 *S.Ct.* 2017, 2024, 153 *L.Ed.*2d 47, 56 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault.").

In 1998, *N.J.S.A.* 2C:43–6.4(b) provided that "[p]ersons serving a special sentence of community supervision *shall be supervised as if on parole and subject to conditions appropriate to protect the public and foster rehabilitation." Ibid.* (prior to 2003 amendment) (emphasis added). Those offenders serving a "special sentence" are under the supervision of the State Parole Board's Division of Parole. *N.J.A.C.* 10A:71–6.11(b). One of the twenty-one general conditions applicable to community-supervised-for-life offenders is "[c]ompl[iance] with any curfew established by the assigned parole officer." *N.J.A.C.* 10A:71–6.11(b)(17). In addition to the general conditions, supervised offenders are required to abide by "any special conditions established by the appropriate [Parole] Board panel." *Ibid.* A violation of a "condition of a special sentence" is a fourth-degree crime carrying a presumption of imprisonment. *N.J.S.A.* 2C:43–6.4(d). Finally, a supervised offender may be released from lifetime community supervision "upon proof" submitted to the Superior Court "that [he] has not committed a crime for 15 years since the last conviction or release from incarceration, whichever is later, and that [he] is not likely to pose a threat to the safety of others if released from supervision." *N.J.S.A.* 2C:43–6.4(c) (prior to the 2003 amendment).[7]

---

[7] The current version of *N.J.S.A.* 2C:43–6.4(c) requires that the "proof" be "by clear and convincing evidence."

## IV.

Now, we must determine whether Jamgochian, as a community-supervised-for-life offender, was entitled to due process of law and, if so, how much process before the Parole Board imposed the daily, eleven-hour curfew.

The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const.* amend. XIV, § 1. Although Article I, Paragraph 1 of the New Jersey Constitution does not expressly state that due process of law protects persons from arbitrary government action, it does provide "that every person possesses the 'unalienable rights' to enjoy life, liberty, and property, and to pursue happiness." *Lewis v. Harris,* 188 *N.J.* 415, 442, 908 *A.*2d 196 (2006). We have construed the expansive language of Article I, Paragraph 1 to embrace the fundamental guarantee of due process. *See Doe, supra,* 142 *N.J.* at 99, 662 *A.*2d 367. Because we have, from time to time, construed Article 1, Paragraph 1 to provide more due process protections than those afforded under the United States Constitution, *see Avant v. Clifford,* 67 *N.J.* 496, 519 n. 20, 341 *A.*2d 629 (1975), we analyze the due process concerns in this case under our State Constitution, confident that any remedy we prescribe will be sufficient under the Federal Constitution.

 "[D]ue process rights are found whenever an individual risks governmental exposure to a 'grievous loss.'" *State ex rel. D.G.W.,* 70 *N.J.* 488, 501, 361 *A.*2d 513 (1976) (quoting *Morrissey v. Brewer,* 408 *U.S.* 471, 484, 92 *S.Ct.* 2593, 2600, 33 *L.Ed.*2d 484, 494 (1972)); *see also id.* at 501–02, 361 *A.*2d 513 (listing certain state actions found to create "exposure to a 'grievous loss'" triggering due process protections—"suspension of students, revocation of probation or parole, revocation of driver's license, denial of social security benefits, termination of welfare benefits, and attachment of wages" (citations omitted)).

■ "The minimum requirements of due process ... are notice and the opportunity to be heard." *Doe, supra,* 142 *N.J.* at 106, 662 *A.*2d 367. We have recognized that "[t]he requirements of due process are, of necessity, flexible, calling for such procedural protections as the situation demands. Simply put, 'not all situations calling for procedural safeguards call for the same kind of procedure.'" *D.G.W., supra,* 70 *N.J.* at 502, 361 *A.*2d 513 (quoting *Morrissey, supra,* 408 *U.S.* at 481, 92 *S.Ct.* at 2600, 33 *L.Ed.*2d at 494). To determine the precise procedural protections mandated by due process in a particular case, we have applied the balancing test set forth in *Mathews, supra,* which considers three discrete factors:

[F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

[424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33, *quoted in Doe, supra,* 142 *N.J.* at 107, 662 *A.*2d 367.]

Thus, we begin by analyzing the first factor, the private interest, which is Jamgochian's purported liberty interest as a community-supervised-for-life offender—his right, if any, to be free from a curfew that he claims was imposed without due process.

### A.

■ We hardly need say that a person facing a criminal prosecution and the potential loss of freedom has a significant liberty interest at stake and is entitled to the fullest protection of due process. It is recognized, as well, that parolees, probationers, and even prisoners have liberty interests that implicate the commands of due process. *See Morrissey, supra,* 408 *U.S.* at 482, 92 *S.Ct.* at 2601, 33 *L.Ed.*2d at 495 (parolees); *Gagnon v. Scarpelli,* 411 *U.S.* 778, 781–82 & n. 3, 93 *S.Ct.* 1756, 1759–60 & n. 3, 36 *L.Ed.*2d 656, 661–62 & n. 3 (1973) (probationers); *Wolff v. McDonnell,* 418 *U.S.* 539, 555–56, 572 n. 19, 94 *S.Ct.* 2963, 2974–75, 2982 n. 19, 41 *L.Ed.*2d 935, 950–51, 960 n. 19 (1974) (prisoners). Thus, a

parolee has a liberty interest in his continued freedom, and because the termination of parole "inflicts a 'grievous loss' on the parolee and often on others," a parolee is entitled to a requisite degree of process. *Morrissey, supra,* 408 *U.S.* at 482, 92 *S.Ct.* at 2601, 33 *L.Ed.*2d at 495. Likewise, a probationer has a liberty interest in being free from revocation of probation. *Gagnon, supra,* 411 *U.S.* at 781–82 & n. 3, 93 *S.Ct.* at 1759–60 & n. 3, 36 *L.Ed.*2d at 661–62 & n. 3.

 A prisoner also has a liberty interest implicated by the potential loss of good-time credit or the "imposition of 'solitary' confinement" resulting from discipline for serious misconduct, *Wolff, supra,* 418 *U.S.* at 556, 572 n. 19, 94 *S.Ct.* at 2974–75, 2982 n. 19, 41 *L.Ed.*2d at 950–51, 960 n. 19, and by any "action which would tend to affect [his] release or parole date or have a major change in the condition of confinement," *Avant, supra,* 67 *N.J.* at 519 & n. 20, 341 *A.*2d 629. Even the imposition of restitution as a condition of probation triggers the demands of due process, not only because the deprivation of property is at issue, but also because the defendant's "obvious 'liberty' interest in his continued probationary 'freedom' " is threatened if he does not meet his restitution obligation. *D.G.W., supra,* 70 *N.J.* at 502–03, 361 *A.*2d 513.

 In light of the cases in which both the United States Supreme Court and this Court have recognized liberty interests, we conclude that Jamgochian, three-and-one-half years after completing his sentence, and even while on lifetime community supervision, had a liberty interest in his continued freedom, and that an eleven-hour curfew, every day for sixteen months, implicated that interest. We do not agree with the Board that, because Jamgochian was subject to parole conditions during his lifetime community supervision, a curfew—however arbitrarily imposed—did not amount to an additional curtailment of a liberty interest. The common thread running through the parole and probation revocation cases and prison disciplinary cases is that even those who possess a conditional or limited freedom have a right to protection

from arbitrary government action. *See Gagnon, supra,* 411 *U.S.* at 782 & n. 3, 93 *S.Ct.* at 1759–60, 1759 n. 3, 36 *L.Ed.*2d at 661–62 & n. 3; *Morrissey, supra,* 408 *U.S.* at 481–82, 92 *S.Ct.* at 2600–01, 33 *L.Ed.*2d at 494–95; *Avant, supra,* 67 *N.J.* at 519 n. 20, 341 *A.*2d 629; *see also Pazden v. N.J. State Parole Bd.,* 374 *N.J.Super.* 356, 370, 864 *A.*2d 1136 (App.Div.2005).

 On the other hand, we do not agree with Jamgochian that his status as a community-supervised-for-life offender entitles him to the "full panoply of rights" available at a criminal trial before a curfew can be imposed, or that he is necessarily entitled to the same procedural protections afforded at a parole or probation revocation hearing. There is a difference between re-incarceration in State Prison—the complete loss of one's freedom—and confinement for part of each day to the comforts of one's home. Therefore, the liberty interest at issue here, however defined, is greater than the Board would admit and less than Jamgochian would have us find.

We now move to the second *Mathews* factor, the risk of an erroneous deprivation of Jamgochian's liberty interest through the procedures used by the Board in imposing the curfew.

### B.

At the time Jamgochian was released from prison, he acknowledged that he was subject to twenty-two general conditions as part of his "special sentence of community supervision for life," *N.J.A.C.* 10A:71–6.11(b), including "any curfew established by the assigned parole officer," *N.J.A.C.* 10A:71–6.11(b)(17). The applicable regulations do not provide for any process when a curfew is imposed as a general condition. In this case, the curfew was imposed three-and-one-half years after he completed his sentence. The Board explained that the curfew was denominated as a special condition because it was imposed at the same time as the special conditions that he have no contact with Sarah and receive mental health counseling. The only additional process provided, because the curfew was called a special condition, was that the District

Parole Supervisor or his representative had to conclude that the curfew "would reduce the likelihood of recurrence of criminal behavior," that Jamgochian had to "be given written notice upon the imposition of [the curfew]," and that the curfew was not "effective until affirmed by the appropriate Board panel." *N.J.A.C.* 10A:71–6.11(*l*).

Jamgochian did not receive notice before the curfew was imposed and was not given a meaningful opportunity to challenge the curfew before it was affirmed by the two-person Board panel. After the two-member panel's decision, and upon his request, Jamgochian received the documents on which the panel relied in affirming the curfew. Although Jamgochian submitted to the full Board a letter challenging the panel's decision, the curfew remained in effect for the ten months pending the full Board's ruling.

A comparison between the almost total absence of process in this case and the process required before parole or probation can be revoked or a prisoner can be seriously disciplined provides a useful perspective. Procedural safeguards are required in parole and probation violation cases to ensure that a parolee or probationer is not erroneously imprisoned, and in prisoner disciplinary cases to ensure that a prisoner is not wrongly subject to such punishment as solitary detention or loss of good time credits. *Wolff, supra,* 418 *U.S.* at 555–58, 94 *S.Ct.* at 2974–76, 41 *L.Ed.*2d at 950–52; *Gagnon, supra,* 411 *U.S.* at 782 & n. 3, 93 *S.Ct.* at 1759–60, 1759 n. 3, 36 *L.Ed.*2d at 661–62 & n. 3; *Morrissey, supra,* 408 *U.S.* at 482–83, 92 *S.Ct.* at 2600–01, 33 *L.Ed.*2d at 495–96.

■ For example, before parole can be revoked, due process requires at a minimum:

(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers;

and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

[*Morrissey, supra,* 408 *U.S.* at 489, 92 *S.Ct.* at 2604, 33 *L.Ed.*2d at 499; *see also Gagnon, supra,* 411 *U.S.* at 782 & n. 3, 93 *S.Ct.* at 1759–60 & n. 3, 36 *L.Ed.*2d at 661–62 & n. 3 (finding same protections apply to probationers).]

Additionally, consistent with due process, a prisoner facing serious discipline for an institutional infraction must be provided with advance written notice of the charges, a reasonable period to prepare his defense, and a hearing before a neutral hearing officer at which he may present witnesses and evidence in his defense. *Avant, supra,* 67 *N.J.* at 525–32, 341 *A.*2d 629; *see also Wolff, supra,* 418 *U.S.* at 563–64, 94 *S.Ct.* at 2978–80, 41 *L.Ed.*2d at 955–57. Moreover, the prisoner is allowed to cross-examine witnesses unless the hearing officer gives reasons on the record for barring cross-examination. *Avant, supra,* 67 *N.J.* at 532, 341 *A.*2d 629. Last, the hearing officer must issue a written statement explaining the decision for the disciplinary action. *Id.* at 533, 341 *A.*2d 629; *see also Wolff, supra,* 418 *U.S.* at 563–64, 94 *S.Ct.* at 2978–79, 41 *L.Ed.*2d at 955–56. We also have recognized that the minimal requirements of due process, notice and an opportunity to be heard, are mandated before restitution can be ordered as a condition of a defendant's probation. *D.G.W., supra,* 70 *N.J.* at 505–08, 361 *A.*2d 513.

The lack of process afforded to a community-supervised-for-life offender, who may be confined to his home indefinitely and for as many hours a day as the Parole Board determines suitable, stands in stark contrast to the examples given above. The loss of freedom occasioned by home confinement is not as complete as imprisonment in a penal institution, but it is, nevertheless, a deprivation of liberty. Meaningful procedural protections that would lessen the likelihood of the mistaken imposition of a curfew, in this case one lasting sixteen months, serve both the interests of the supervised offender and the State. Respect for the law is not bred by imposing penalties unfairly and arbitrarily. Rehabilitation of an offender may not be advanced if prohibited conduct is

wrongly ascribed to him. *See Morrissey, supra,* 408 *U.S.* at 484, 92 *S.Ct.* at 2601, 33 *L.Ed.*2d at 496.

Therefore, we find that the procedural protections available to an already-released, community-supervision-for-life offender facing a curfew are woefully inadequate. We next discuss, in light of the administrative burden that would have to be borne by the State, the minimal protections that must be afforded when curfews are imposed some time after a community-supervised-for-life offender has been released from prison.[8]

## C.

Under the *Mathews* test, the individual's liberty interest and the value of added procedural protections must be balanced against the State's interest in maintaining a manageable parole system. *See D.G.W., supra,* 70 *N.J.* at 502–03, 361 *A.*2d 513. We begin by noting that the Board argues that any additional process beyond the present, almost non-existent process will be an undue administrative burden and counterproductive to the rehabilitation of the supervised offender. The administrative burden argument made here as a justification for denying minimal due process protections is similar to those arguments that were advanced in the past to attempt to justify little process in parole and revocation proceedings and prisoner disciplinary proceedings. *See, e.g., Morrissey, supra,* 408 *U.S.* at 483, 92 *S.Ct.* at 2601, 33 *L.Ed.*2d at 495. When balanced against the significant consequences of wrongly depriving a supervised offender of his freedom without due process, we

---

[8] A curfew that is imposed immediately upon a supervised offender's release from prison may be distinguished from one imposed after the offender has lived in the community for some period of time. A reasonable curfew imposed at the time of the offender's release may relate back to the reasons for the original sentence or may serve as a transition period, during which the offender may be monitored more closely while he completes his reentry into society. However, a curfew imposed after an offender has lived freely in society for some period of time must be related to conduct engaged in by the offender after his release. Meaningful process limits the potential for a curfew to be arbitrarily imposed or imposed for conduct wrongly ascribed to the supervised offender.

find that the administrative burden argument is a poor rationale for upholding the current system.

It is difficult to see how a supervised offender's rehabilitation will be furthered if he is placed on a curfew for reasons that, if process were given, would prove to be mistaken. While it is true that community-supervised-for-life offenders know that parole conditions may be imposed as part of their "special sentence," *N.J.S.A.* 2C:43–6.4(b), and that the purpose of those conditions is "not designed to punish" but rather to protect the public and promote rehabilitation, *Doe, supra,* 142 *N.J.* at 13, 662 *A.*2d 367, that does not mean that the justification for a curfew should be nothing more than the caprice of a parole officer. *See Pazden, supra,* 374 *N.J.Super.* at 370, 864 *A.*2d 1136 (noting that when laws impact important rights "enforcement should not be left open to broad interpretation nor to the personal view of any particular parole officer").

The Parole Board monitors over three thousand community-supervised-for-life offenders, and more than two hundred of those offenders are currently on curfew. *Jamgochian, supra,* 394 *N.J.Super.* at 539, 928 *A.*2d 1. We are mindful that providing certain due process protections to guard against the erroneous deprivation of a supervised offender's liberty will place an additional burden on the Parole Board, but that is the price that must be paid in a society committed to ordered liberty and opposed to arbitrary injustice. We do not underestimate the need for community supervision of previously convicted sexual offenders and properly imposed curfews, and will not mandate a regime that will make it impractical to impose a necessary curfew provision to protect the public or rehabilitate the offender. *See Doe, supra,* 142 *N.J.* at 15 n. 1, 662 *A.*2d 367 (noting relatively high recidivism rate of sexual offenders); *see also McKune, supra,* 536 *U.S.* at 33, 122 *S.Ct.* at 2024, 153 *L.Ed.*2d at 56–57 (same).

We find that the balance of interests weighs in favor of giving a supervised offender the opportunity to respond in a meaningful way to allegations or charges that have prompted the

imposition of a curfew. Therefore, before a curfew can be imposed, due process demands that, in circumstances such as here, a supervised offender must be given reasonable notice and a meaningful opportunity to be heard.[9] We recognize, however, that, on an emergent basis, a curfew may be imposed to ensure the public's safety before affording a supervised offender an opportunity to be heard. In that event, within a reasonably brief period of time, the supervised offender must be given the opportunity to be heard and, when appropriate, a hearing.

As noted earlier, due process is a flexible concept. *D.G.W., supra,* 70 *N.J.* at 501, 361 *A.2d* 513. The level of process to be afforded a supervised offender subject to a curfew will depend on a number of variables, including: the number of hours imposed as a curfew, i.e., six, twelve, eighteen, or twenty-four hours; the length of the curfew, i.e., days, weeks, months, years, indefinite; the nature of the allegations warranting the curfew and whether the allegations are challenged or unrebutted, in which case the only question may be the inferences to be drawn from uncontested facts; and whether credibility determinations based on opposing accounts are material to resolve the question at issue.

In many cases in which the supervised offender wishes to contest the matter, due process will be satisfied by giving him both specific notice of the claimed misconduct or improper behavior and the opportunity to respond by letter with supporting attachments, such as certifications or affidavits. To merit a hearing, the supervised offender first must deny the allegations or contest the conclusions to be drawn from the allegations or the rationale supporting the curfew. A community-supervised-for-life offender is not shielded, as is the accused in a criminal case, by

---

[9] Although at times we have relied on the doctrine of fundamental fairness to require additional procedures "to protect the rights of defendants at various stages of the criminal justice process even when such procedures were not constitutionally compelled," *Doe, supra,* 142 *N.J.* at 107–08, 662 *A.2d* 367, in the context of this case, we find that the protections afforded by due process and fundamental fairness are co-extensive.

the presumption of innocence. Proceedings before the Parole Board concerning the propriety of a curfew are *not* criminal in nature. *See Morrissey, supra,* 408 *U.S.* at 480, 92 *S.Ct.* at 2600, 33 *L.Ed.*2d at 494. As with the defendant in a civil case, the supervised offender does not get to press his case unless he first denies the charges or contests the rationale for the curfew. *Cf. R.* 4:5–5. To ensure the integrity of the response, we will require that the supervised offender certify to the truth of the denial.

■ In this case, while his matter was pending before the Parole Board, Jamgochian never denied the statements made by Sarah to the police, even after the police reports were made available to him. We do not consider Jamgochian's remark to his parole officer—"this was all bullshit. That even if I made a call, what would that have to do with a curfew?"—to constitute a denial of Sarah's allegations. Jamgochian's statement instead strongly suggests that he thought the matter had been blown out of proportion by his parole officer, whom he had accused of unethical conduct. We are persuaded that the Parole Board could reasonably have inferred that his offer of easy money to seventeen-year-old Sarah and his repeated warnings that she not tell anyone about their conversations, including her parents, resembled the pattern of his prior criminal activity and warranted the imposition of a curfew. Nevertheless, Jamgochian should have been entitled to challenge, whether in writing or in person, the inferences to be drawn from Sarah's account, and the rationale for the imposition of the curfew.

■ After receiving a detailed notice of the proposed parole condition, a supervised offender who denies the factual allegations supporting the imposition of a curfew or contests the rationale for the curfew must be given a meaningful opportunity to be heard. In many cases, the information that drives the need for a curfew will fall within the exclusive knowledge of the parole officer. In other cases, an individual in the community may possess information, as here, that will inform the ultimate decision of the Parole Board. When the material facts in dispute can only be resolved

by credibility determinations, a hearing ordinarily would be in order. For example, if a supervised offender denies being present at a place where he was forbidden to be and the truth of the matter depends on which set of witnesses to believe, the hearing officer might necessarily have to take testimony and make findings concerning the credibility of the witnesses. The variables at play, as we noted earlier, will inform the level of process required. We do not envision that a curfew of brief duration would ordinarily require a hearing necessitating the taking of testimony. On the other hand, a curfew that lasts as long as the one in this case, depending on whether the charges and rationale for the curfew are disputed, will call for considerably more process.

The format approved by this Court in *Avant* for prisoner disciplinary cases is a useful paradigm for addressing the issue before us. A supervised offender should be given sufficient notice "to enable him to marshal the facts and prepare a defense." *Avant, supra,* 67 *N.J.* at 525, 341 *A.2d* 629. That would require affording the supervised offender access to the "evidence against him" to prepare a defense. *Morrissey, supra,* 408 *U.S.* at 489, 92 *S.Ct.* at 2604, 33 *L.Ed.*2d at 499; *cf. State v. Kunz,* 55 *N.J.* 128, 144–46, 259 *A.2d* 895 (1969) (requiring that defendants be given access to presentence reports so that they may be "afforded fair opportunity to meet any prejudicial material which may play a part in the sentencing").

The supervised offender also should be given a timely opportunity to respond to the allegations justifying the curfew. *Cf. Avant, supra,* 67 *N.J.* at 529, 341 *A.2d* 629. On those occasions when it is necessary for the Board to impose a curfew on an emergent basis, the supervised offender must be given the opportunity to be heard and, if appropriate, given a hearing, within a reasonably brief period of time.

If a hearing is conducted because, for instance, credibility issues are critical to any factfinding, then the supervised offender should be allowed to call witnesses and provide documentary

evidence, and to cross-examine witnesses if necessary for an adequate presentation of the case. *Cf. id.* at 529–32, 341 *A.2d* 629. If the Parole Board or a Board panel determines that there is good cause for foreclosing cross-examination, it should place its reasons on the record or in writing. *Ibid.*

 The relaxed rules of evidence governing an administrative hearing will apply to a hearing involving the proposed imposition of a curfew. *See N.J.S.A.* 52:14B–10 (providing that "[t]he parties shall not be bound by rules of evidence" and "[a]ll relevant evidence is admissible"); *N.J.R.E.* 101(a)(3). As in administrative proceedings, hearsay evidence will be admissible, subject to the sound discretion of the Parole Board. *See N.J.A.C.* 1:1–15.5 (providing that hearsay evidence may be admitted "subject to the judge's discretion," but "some legally competent evidence must ... support each ultimate finding of fact").

It is not our intention to prescribe a comprehensive regulatory scheme, but to draw the contours of the minimum requirements mandated by due process. Discretion must be invested in the Parole Board, which has the agency expertise and authority to implement a scheme that can address the unique circumstances of each case.

## V.

To summarize, we find that a community-supervised-for-life offender, who, for some time, has been released into the community, must be afforded due process of law before the Parole Board can impose a curfew confining the offender to his home. The level of process will depend on a number of variables and the unique circumstances of each case. At a minimum, a supervised offender must be provided reasonable notice and a meaningful opportunity to be heard.

In this case, as a result of the curfew imposed, Jamgochian was confined to his home eleven hours every day for sixteen months. As we have discussed, Jamgochian did not explicitly deny the

allegations of the seventeen-year-old complainant, a prerequisite for a testimonial hearing to challenge the allegations. Based on the record before us, the Parole Board could reasonably have concluded that Jamgochian's conduct had the appearance of a prelude to recidivism. Nevertheless, Jamgochian still should have been given the opportunity to contest both the inferences to be drawn from those allegations and the rationale supporting the imposition of the curfew. Importantly, Jamgochian is no longer under a curfew, and therefore this decision will apply to future curfews that may affect him or other community-supervised-for-life offenders.[10]

Accordingly, we affirm the judgment of the Appellate Division as modified by this opinion.

*For affirmance as modification*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

[10] We again note that *N.J.S.A.* 2C:43–6.4 now refers to community-supervised-for-life offenders as offenders under "parole supervision for life." For purposes of the application of this opinion, we do not find any significance in the new designation given to supervised offenders.