SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

## J.I. v. New Jersey State Parole Board (A-29-15) (076442)

**Argued November 7, 2016 -- Decided March 21, 2017**

**ALBIN, J., writing for a unanimous Court.**

The Court considers: (1) whether a total Internet ban imposed on a community supervision for life offender is so overbroad and oppressive that it serves no rational penological purpose; and (2) whether the New Jersey State Parole Board improperly denied the offender a hearing to challenge the Internet restrictions that he claims were arbitrarily imposed.

J.I. is a sex offender subject to community supervision for life (CSL). In 2003, he pled guilty to one count of sexual assault and two counts of endangering the welfare of a minor, having admitted that he sexually molested his three daughters, who ranged from ages six to fourteen. The trial court's sentence included a term of incarceration and a three-year period of mandatory parole supervision to begin after his release. The court also imposed a special sentence of CSL, to follow the parole supervision period. When J.I. was released in 2009, the New Jersey State Parole Board (Parole Board) informed him that he was prohibited from accessing any social networking service or chat room.

In January 2010, a search of J.I.'s computer revealed that he had visited multiple websites that depicted minors in the nude and was in possession of photos of minors in the nude. He was not charged with a parole violation, but his sex-offender treatment provider indicated that the possession of such material was not conducive to his rehabilitation. As a result, the Parole Board prohibited him from using any Internet-capable device. In October 2010, parole authorities arrested J.I. for possessing a phone with Internet capability and for using it in that capacity. A Parole Board panel subsequently found that J.I. had violated the terms of his supervised release by having an Internet-capable device in his possession and by his earlier accessing pornography and images of nude children. In June 2011, he returned to confinement where he remained until his release in October 2012.

Before his 2012 release, J.I. was informed that he was to refrain from using any computer or device to create any social networking profile or to access any social networking service or chat room unless expressly authorized by the District Parole Supervisor. He otherwise had full Internet access. In 2013, to further his search for employment, J.I. requested that his District Parole Supervisor modify the social networking condition to allow him to access LinkedIn. His request was granted, but the District Parole Supervisor prohibited J.I. from accessing the Internet for any reason other than employment purposes. The District Parole Supervisor justified the near-total Internet ban based on J.I.'s noncompliance, three years earlier, with the social networking/Internet condition and his accessing of inappropriate websites. On December 11, 2013, a panel of the Parole Board affirmed the near-total Internet blackout.

The District Parole Supervisor subsequently admonished J.I. for visiting non-work-related websites. J.I. appealed to the Parole Board. Ten days later, he was admonished again, this time for visiting the websites of the church he attended and "Rent to Own." On March 7, 2014, J.I. and his counsel met with the District Parole Supervisor and a parole officer. The District Parole Supervisor stated that J.I. was never permitted to use a computer or access the Internet until he authorized him to do so and, then, only for work-related purposes. He was prohibited from using the Internet to engage in any activity except to seek employment. J.I. continued to visit websites unrelated to his employment search and as a result, his parole officer barred him from using a computer or the Internet for any purpose. In June 2014, a Parole Board panel affirmed the conditions and denied his request for a hearing. The full Parole Board issued a final agency decision, affirming the authority of the District Parole Supervisor to bar J.I. from using a computer or Internet-capable device. The full Parole Board found the restrictions justified because of J.I.'s willful disregard of the prohibition against accessing non-work-related websites and denied his request for a hearing.

In a published decision, the Appellate Division upheld the Parole Board's decision. 441 N.J. Super. 564 (2015). The panel found that the conditions were reasonable in order to reduce the likelihood of his recidivism and consistent with protecting the public safety and welfare. The Court granted J.I.'s petition for certification. 223 N.J. 555 (2015).

**HELD**: Arbitrarily imposed Internet restrictions that are not tethered to promoting public safety, reducing recidivism, or fostering an offender's reintegration into society are inconsistent with the administrative regime governing CSL offenders. The complete denial of access to the Internet implicates a liberty interest, which triggers due process concerns. After the imposition of the total ban for J.I.'s Internet violations, he should have been granted a hearing. The matter is remanded to the full Parole Board for a hearing in which it must determine whether the total computer and Internet ban serves any public-safety, rehabilitative, or other penological goal.

1. Access to the Internet is a basic need. Most unemployed workers searching for jobs do so on the Internet and it is difficult to imagine how a person could function in modern society given a lifetime ban on all forms of computer access and use. (pp. 17-18)

2. Sex offenders on CSL are subject to continued governmental oversight and diminished personal autonomy. One of the purposes of supervision is to help offenders reintegrate into society. Specific conditions restricting their activities must bear a reasonable relationship to reducing the likelihood of recidivism and fostering public protection and rehabilitation. The Parole Board's Division of Parole is responsible for monitoring CSL offenders. All conditions of CSL must be in writing and signed by the CSL offender at the time of release from custody. CSL requires that offenders refrain from using any computer or device to create a social networking profile or to access any social networking service or chat room unless authorized by the District Parole Supervisor. Requiring that a CSL offender's history inform the imposition of Internet special conditions ensures that they bear a reasonable relationship to promoting public safety and fostering rehabilitation. If the District Parole Supervisor imposes additional special conditions, he must give written notice to the CSL offender and to the Parole Board. The Board panel must advise the District Parole Supervisor within three working days whether it has affirmed the imposition of the special condition. Internet conditions should be tailored to the individual CSL offender, taking into account the underlying offense, the rehabilitative needs of the offender, and public safety. The Legislature evidently did not intend that a total ban on Internet use should be deployed when less restrictive alternatives can achieve the goal of public safety and personal rehabilitation. (pp. 18-23)

3. At the time of J.I.'s second release from confinement, the social networking condition was the only restriction on his use of an Internet-capable device. The District Parole Supervisor was mistaken in his understanding that J.I. was never authorized to use the Internet upon his release. The District Parole Supervisor had no power to impose restrictions orally or without the approval of a Board panel. Despite J.I.'s thirteen-month compliance with the Internet conditions attached to his CSL status, the District Parole Supervisor imposed dramatic restrictions after J.I. requested permission to access a professional networking site that he believed would improve his prospects for employment. He justified the Internet ban based on J.I.'s visiting pornography websites more than three years earlier. J.I.'s simple request for a relaxation of the social networking condition set in motion the imposition of CSL conditions that banished him from nearly all of life's activities on the Internet. Ultimately, the near-total ban was transformed into a complete Internet ban. (pp. 23-25)

4. Federal courts have addressed Internet restrictions on supervised offenders with some frequency. The Third Circuit has upheld a complete ban on internet access, except with prior approval of probation, when offenders have used or have clearly demonstrated a willingness to use the Internet as a direct instrument of physical harm. However, even in child pornography cases, the Third Circuit has declined to deny an offender access to email or benign Internet usage when a more focused restriction, limited to pornography sites and images, can be enforced. (pp. 26-29)

5. J.I. did not use the Internet as a means of committing the offenses for which he was placed on CSL. The record does not suggest that he ever visited a pornographic or illicit website, or used the Internet in any unlawful way, after his ultimate release in October 2012. The Court does not condone defendant's violations of the near-total ban by accessing benign websites. Nevertheless, the special conditions that have brought about this appeal were overbroad. Concerns about J.I.'s potential abuse of the Internet could have been addressed through less restrictive means. The condition denying J.I. access to the Internet for any purpose unrelated to employment was unreasonable because it was not tied to criminal conduct, rehabilitation, or public safety and because the Parole Board had available less restrictive alternatives than a near-total Internet ban to achieve its mission. Further, J.I. was entitled to an opportunity to challenge the proposed imposition of the severely enhanced Internet restrictions. A CSL offender possesses protectible liberty interests and the deprivation of such interests implicates the minimal requirements of due process. (pp. 30-33)

6. The level of process required will depend on a number of variables, including the timing of and justification for the Internet restriction, the severity and length of the restriction, whether facts are contested or uncontested, and whether credibility determinations must be made. The balance of interests weighs in favor of giving a supervised offender the opportunity to respond to a near-total or absolute Internet ban imposed more than a year after the offender's release from confinement. Allowing a CSL offender to file a written submission to a Board panel challenging a District Parole Supervisor's modification of an Internet condition is a sensible accommodation to ensure the due process rights of a CSL offender are consonant with the Parole Board's regulatory scheme. (pp. 35-37)

7. The absolute restriction on J.I.'s access to the Internet may undermine his rehabilitation and hinder his ability to succeed as a free agent in society. Although J.I. has not alleged any factual disputes in the record that would suggest the need for an evidentiary hearing, he is able to submit certifications from his therapist and other relevant sources to the Board's attention. The circumstances of this case, however, call for more process. J.I., personally and/or through his attorney, must be given an opportunity to appear before the Board and be heard. The additional process will not impose an undue administrative burden, and it may reduce the potential for an erroneous deprivation of a liberty interest. (pp. 37-38)

The judgment of the Appellate Division is **REVERSED**. The matter is **REMANDED** to the Parole Board for further proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN'S opinion.**

J.I.,

    Appellant-Appellant,

       v.

NEW JERSEY STATE PAROLE
BOARD,

    Respondent-Respondent.


       Argued November 7, 2016 – Decided March 21, 2017

       On certification to the Superior Court,
       Appellate Division, whose opinion is
       reported at 441 N.J. Super. 564 (App. Div.
       2015).

       Michael C. Woyce argued the cause for
       appellant (Murphy & Woyce, attorneys; Mr.
       Woyce and Joseph S. Murphy, on the briefs).

       Lisa A. Puglisi, Assistant Attorney General,
       argued the cause for respondent (Christopher
       S. Porrino, Attorney General of New Jersey,
       attorney, Ms. Puglisi and Christopher C.
       Josephson, Deputy Attorney General, on the
       letter briefs).

       Fletcher C. Duddy, Deputy Public Defender,
       argued the cause for amicus curiae Office of
       the Public Defender (Joseph E. Krakora,
       Public Defender, attorney).

       Ronald K. Chen argued the cause for amicus
       curiae American Civil Liberties Union of New
       Jersey (Rutgers Constitutional Rights Clinic
       Center for Law & Justice and Edward L.
       Barocas, Legal Director, attorneys; Mr.
       Chen, Mr. Barocas, Jeanne M. LoCicero, and
       Alexander R. Shalom, of counsel and on the

brief).

JUSTICE ALBIN delivered the opinion of the Court.

Today, the Internet plays an essential role in the daily lives of most people -- in how they communicate, access news, purchase goods, seek employment, perform their jobs, enjoy entertainment, and function in countless other ways.

Sex offenders on community supervision for life (CSL) may be subject to restrictive Internet conditions at the discretion of the New Jersey State Parole Board (the Parole Board), provided the conditions promote public safety and/or the rehabilitation of the offender. In this case, the first issue is whether a total Internet ban imposed on a CSL offender was unnecessarily overbroad and oppressive and whether it served any rational penological purpose. The second issue is whether the Parole Board improperly denied J.I. a hearing to challenge the Internet restrictions that he claims were arbitrarily imposed.

J.I. is a sex offender subject to community supervision for life. After his release from confinement, J.I. was allowed full access to the Internet, with one exception: he could not visit an Internet social networking site without the approval of his District Parole Supervisor.

After J.I. had served thirteen months on community supervision for life without incident, his District Parole Supervisor totally banned his access to the Internet except for

2

employment purposes. The District Parole Supervisor justified the ban based not on J.I.'s conduct while on community supervision for life, but rather on his conduct years earlier -- the accessing of pornography sites and the possession of pornography -- that led to a violation of his parole. A Parole Board panel affirmed, apparently with no input from J.I.

Following imposition of that near-total Internet ban, J.I. accessed several benign websites, such as those of his church and therapist, after repeated warnings not to do so. As a result, the parole authorities completely banned J.I. from possessing any Internet-capable device. The Parole Board upheld that determination and denied J.I. a hearing. The Appellate Division affirmed.

We now reverse and remand to the Parole Board. Conditions imposed on CSL offenders -- like those imposed on regular parolees -- are intended to promote public safety, reduce recidivism, and foster the offender's reintegration into society. Arbitrarily imposed Internet restrictions that are not tethered to those objectives are inconsistent with the administrative regime governing CSL offenders. We agree with the position taken by federal courts that Internet conditions attached to the supervised release of sex offenders should not be more restrictive than necessary.

The sheer breadth of the initial near-total Internet ban,

3

after J.I.'s thirteen months of good behavior, cannot be easily justified, particularly given the availability of less restrictive options, including software monitoring devices and unannounced inspections of J.I.'s computer. After the imposition of the total ban for J.I.'s Internet violations, J.I. should have been granted a hearing before the Parole Board to allow him to challenge the categorical Internet blackout. The complete denial of access to the Internet implicates a liberty interest, which in turn triggers due process concerns.

Accordingly, we remand to the full Parole Board for a hearing consistent with this opinion. The Board must determine whether the current total computer and Internet ban imposed on J.I. serves any public-safety, rehabilitative, or other penological goal.

I.

A.

In 2003, J.I. pled guilty to one count of second-degree sexual assault, N.J.S.A. 2C:14-2(b), and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). J.I. admitted that, over a period of time, he sexually molested his three daughters, who ranged from six to fourteen years old. The trial court sentenced J.I. to a seven-year prison term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the sexual assault charge and to concurrent terms of seven years on

4

the endangering charges. The court found that J.I.'s "conduct was characterized by a pattern of repetitive and compulsive behavior" and that he was amenable to sex offender treatment, and therefore ordered that the sentence be served at the Adult Diagnostic and Treatment Center (ADTC). The court also imposed a three-year period of mandatory parole supervision, to begin after J.I.'s release from custody, and a special sentence of community supervision for life, to follow the parole supervision period. Additionally, J.I. is subject to the registration and notification requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23.

Upon J.I.'s release from confinement in October 2009, the Parole Board served him with the conditions of his mandatory parole supervision, which included the mandate that he refrain from accessing any social networking service or chat room. In January 2010, a parole officer's search of J.I.'s computer revealed that J.I. had visited multiple websites that "depicted minors in the nude." J.I. admitted to doing so. A parole officer also found in J.I.'s possession "'barely legal' DVDs and a book of 'artistic' photos of pre-teen and minor females in the nude."

J.I. was not charged with a criminal offense or parole violation, but his sex-offender treatment provider indicated that the possession of such material was "not conducive to

5

[J.I.'s] rehabilitation or reintegration into society." In light of J.I.'s conduct, the Parole Board prohibited J.I. from using any Internet-capable device.

In October 2010, the parole authorities arrested J.I. for possessing a mobile phone with Internet capability and for using it "regularly in that capacity." In March 2011, a panel of the Parole Board found that J.I. had violated the conditions of his supervised release by having "an Internet capable device in his possession" and by his earlier "accessing pornography and images of nude children." In June 2011, J.I. returned to confinement at the ADTC, where he remained until his release sixteen months later.

B.

Before his release in October 2012, J.I. acknowledged in writing the conditions attached to his community supervision for life. The only restriction on J.I.'s use of a computer or the Internet was that he "refrain from using any computer and/or device to create any social networking profile or to access any social networking service or chat room . . . unless expressly authorized by the District Parole Supervisor." Under the social networking condition, J.I. was prohibited from accessing websites such as Facebook and Match.com. J.I. otherwise had full access to the Internet. Indeed, a Deputy Attorney General confirmed by email that the social networking restriction was

6

the only limitation on J.I.'s use of the Internet.

In 2013, J.I. was sixty-two years old, unemployed, and without the means to pay the mortgage on the home where his wife and son lived or otherwise provide financial assistance to his family. To further his search for employment, J.I. requested that his District Parole Supervisor modify the social networking condition to allow him to access LinkedIn, a job-related networking site. At this point, J.I. was in compliance with all the conditions of his community supervision for life, including the Internet conditions.

In response to J.I.'s request for a limited modification to the social networking condition, on December 5, 2013, J.I.'s District Parole Supervisor prohibited J.I. from accessing the Internet for any purpose other than employment purposes, subject to his installing monitoring software on his computer. J.I.'s request to access LinkedIn was granted. J.I., however, was now subject to far more onerous Internet restrictions than before his request for relief -- despite his thirteen-month compliance with the terms of his community supervision. The District Parole Supervisor justified this near-total Internet ban based on J.I.'s noncompliance, three years earlier, with "the State Parole Board's Social Networking/internet condition and his use of questionable and inappropriate internet sites." Six days later, on December 11, 2013, a panel of the Parole Board

7

affirmed the near-total Internet blackout.  Nothing in the Board panel's statement of reasons suggests that J.I. had the opportunity to submit written objections to the newly imposed Internet restrictions.

Almost fifty days later, the District Parole Supervisor admonished J.I. for visiting non-work-related websites -- a car-buying website, "Godtube," "Morris Psychological Group," and "Covenant Eye."[1]  Covenant Eye was the filtering website program that allowed J.I.'s parole officer to track and monitor his Internet usage.

On February 17, 2014, J.I. appealed to the Parole Board the conditions imposed by the District Parole Supervisor, restricting his computer and Internet access to employment-related uses.  Ten days later, J.I. was admonished again, this time for visiting the websites of the church he attended -- the Parsippany Baptist Church -- and "Rent to Own."

On March 7, 2014, J.I. and his counsel met with the District Parole Supervisor and a parole officer.  At this meeting, the District Parole Supervisor stated that J.I. was never permitted to use a computer or access the Internet until

---

[1] According to J.I. (per his Appellate Division brief), Godtube is a "religious website providing spiritual guidance through videos and biblical passages," and the Morris Psychological Group is where "his sex offender specific therapist is employed."  Contact information for that therapist is located on the Group's website.

8

he authorized him to do so and, then, only for work-related purposes. The District Parole Supervisor's assertion conflicted not only with the written CSL conditions issued at the time of J.I.'s release from custody, but also with assurances given to J.I.'s attorney by a Deputy Attorney General. The District Parole Supervisor made clear that J.I. could not use the Internet to communicate with relatives, visit his church's website, make purchases, bank, or engage in any other benign activity except to seek employment.

After the meeting, J.I. continued to visit websites unrelated to his employment search: typesofaid.com, a website explaining different assistance programs, and slimming.com, a website offering weight-loss counseling. In response, J.I.'s parole officer barred him from using a computer or the Internet for any purpose. J.I. was also advised that if any Internet-capable device -- such as an iPhone -- were found in his possession, he would be arrested. The parole authorities did not allege that J.I. accessed pornographic or illicit websites since his release from confinement.

In June 2014, a Parole Board panel affirmed the "computer/Internet" and "social networking" conditions attached to J.I.'s community supervision for life and denied his request for an evidentiary hearing.

C.

On administrative appeal, J.I. urged the full Parole Board to remove the Internet and computer restrictions and grant him an evidentiary hearing.

On October 29, 2014, the full Parole Board issued a final agency decision, affirming the authority of the District Parole Supervisor to bar J.I. from using a computer or Internet-capable device and requiring him "to provide the nature and purpose of each request for computer/Internet use or social networking." According to the Board, the Division of Parole would determine whether each request for Internet use was consistent with J.I.'s rehabilitative needs based on supporting documentation.

The Parole Board found that the Division of Parole's complete restriction on J.I.'s use of a computer or Internet-capable device was justified because of his "willful disregard" of the prohibition against accessing non-work-related websites. The Board also denied J.I.'s request for an evidentiary hearing, reasoning that the computer/Internet access ban did not constitute the infringement of a liberty interest similar to the imposition of a curfew and that no factual issue had to be resolved.

D.

A panel of the Appellate Division upheld the Parole Board's decision to keep standing a total ban on J.I.'s access to a computer and the Internet as a condition of his community

10

supervision for life.  J.I. v. N.J. State Parole Bd., 441 N.J. Super. 564 (App. Div. 2015).  In doing so, the panel reaffirmed the constitutionality of N.J.A.C. 10A:71-6.11(b)(23).[2]  Id. at 578-79; see also J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327, 341 (App. Div. 2013), certif. denied, 217 N.J. 296 (2014). That provision allows a Parole Board panel to order a parolee to "[r]efrain from using any computer and/or device to create any social networking profile or to access any social networking service."  N.J.A.C. 10A:71-6.11(b)(23).  The panel indicated that its affirmance of the social networking restriction in J.B. did not suggest that the Parole Board could not impose an absolute ban on the use of an Internet-capable device in a particular case.  J.I., supra, 441 N.J. Super. at 579.

The panel also rejected J.I.'s ex-post facto and as-applied due process challenges to N.J.A.C. 10A:71-6.11(b)(23), which was adopted before J.I. began serving his community supervision for life but after the events resulting in his convictions.  Id. at 580-82.  The panel held that the regulation "is remedial in purpose and effect, not punitive" and that "[i]t is aimed at

---

[2] In 2012, N.J.A.C. 10A:71-6.11(b)(22) was amended to include certain definitions, including definitions of "Internet website or application," "social networking service," and "chat room." See 44 N.J.R. 30(a) (Jan. 3, 2012).  In December 2016, the section was recodified, with no alteration to the text, at N.J.A.C. 10A:71-6.11(b)(23).  See 48 N.J.R. 2612(b) (Dec. 5, 2016).

11

protecting the public from sex offenders, fostering rehabilitation, and reducing the likelihood of recidivism." Id. at 582.

The panel, moreover, rejected J.I.'s argument that the Parole Board's decision to uphold an "absolute ban on his use of an Internet-capable device" was arbitrary and capricious. Id. at 583. The panel asserted that the absolute ban was justified because of J.I.'s repeated violations of the conditions of his community supervision, which limited his Internet use to employment purposes; the nature of the crimes he committed; and his earlier accessing of pornographic material. Id. at 584. The panel found that the special "conditions were reasonable in order to reduce the likelihood of his recidivism and consistent with protecting the public safety and welfare and fostering his rehabilitation." Ibid. The panel concluded that J.I. had a due process right "of notice and an opportunity to object to the conditions and request broader Internet access," but not a right to a hearing. Id. at 584-85.

We granted J.I.'s petition for certification. J.I. v. N.J. State Parole Bd., 223 N.J. 555 (2015). We also granted the motions of the American Civil Liberties Union of New Jersey (ACLU-NJ) and the Office of the Public Defender to participate as amici curiae.

II.

12

A.

J.I. contends that the issue is not whether the Parole Board may restrict a supervised sex offender from particular Internet websites or social networks, but whether it may impose a total ban on Internet access in the circumstances of this case. J.I. submits that the restrictions imposed by his District Parole Supervisor, and affirmed by the Parole Board, denying him complete access to the Internet were constitutionally overbroad and in violation of his free speech rights under the United States and New Jersey Constitutions. He asserts that he has never used the Internet to commit a crime or seek out a victim and therefore the total Internet restriction is not narrowly tailored to advance a legitimate state interest.

J.I. asserts that prohibiting him from possessing a computer or Internet-capable device is a form of banishment, leaving him "without access to nearly every communicative device used in the modern world." J.I. states that absolute Internet bans as a condition of parole, even when subject to modification by a probation officer, have been deemed unreasonable by panels of the United States Court of Appeals for the Third Circuit, citing United States v. Albertson, 645 F.3d 191 (3d Cir.), cert. denied, 564 U.S. 1028, 131 S. Ct. 3045, 180 L. Ed. 2d 862 (2011); United States v. Heckman, 592 F.3d 400 (3d Cir. 2010); United States v. Voelker, 489 F.3d 139 (3d Cir. 2007). Last,

13

J.I. argues that the Internet ban deprived him of a liberty interest, triggering his due process right to a hearing before the Parole Board.

## B.

The ACLU-NJ submits that the relevant statutes and regulations governing CSL offenders should be read so that their reach does not exceed constitutional bounds. The exercise of unbridled discretion by parole officers in setting Internet restrictions, the ACLU-NJ posits, offends constitutional norms. The ACLU-NJ states that, when imposing broad-ranging Internet restrictions, the Parole Board should be required to make "a particularized showing that the restrictions are justified" based on both a review of the offender's prior conduct and an assessment of the current risk that he will use the Internet for "predatory conduct." It submits that Internet restrictions should be narrowly tailored "when applied to offenders who do not have a history of prohibited behavior through the Internet."

## C.

The Public Defender contends that the absolute Internet ban violates not only J.I.'s First Amendment rights, but also his right to be free from arbitrary and unreasonable government action. The Public Defender emphasizes that the Internet played no role in the crimes J.I. had committed and that J.I. had not displayed any time-relevant inclination to view pornography on

the Internet.  The Public Defender asserts that the standard adopted by the Third Circuit -- requiring that Internet restrictions be narrowly tailored to serve a legitimate purpose -- is consistent with our administrative statutory scheme and constitutional principles.  That standard, he observes, takes into account the immense role that the Internet plays in modern-day life and recognizes the hardships caused to offenders seeking employment and reintegration into society by severe Internet restrictions.

### D.

The Parole Board asks this Court to affirm the Appellate Division because the Internet restrictions imposed on J.I. were based on substantial evidence in the record and did not violate any of his constitutional rights.  The Board contends that the reasonableness of Internet conditions imposed on released sex offenders is "not viewed through the traditional lens of First Amendment jurisprudence"; instead, the reasonableness of those conditions is viewed in light of the offenders' CSL status.  Accordingly, the Board maintains that the First Amendment is not offended in this setting if restrictions "bear a reasonable relationship to the State's important interests of protecting the public and fostering rehabilitation."  The Board insists that the Internet restrictions placed on J.I. struck "a fair balance between those interests and [J.I.'s] interests in free

15

expression and association."

The Board also argues that the cited Third Circuit cases are not pertinent because they interpret federal statutory provisions. The Board states that the Internet restriction is not imposed "as a general condition of supervision," but only "on an individualized basis as a special condition," such as here, where the "offender defies less restrictive conditions concerning inappropriate Internet use." The Board asserts that it "must have the discretion to impose and remove conditions in response to an offender's behavior -- both to assist in rehabilitating him and to protect the public."

Finally, the Board insists that J.I. was given all the process to which he was entitled: "notice and a meaningful opportunity to be heard" when the special condition barring Internet/computer access was imposed. The Board submits that the total Internet/computer ban does "not impose a significant restraint on the offender's liberty that would trigger the heightened process" this Court established for curfews in Jamgochian v. New Jersey State Parole Board, 196 N.J. 222, 239-42 (2008).

### III.

This appeal raises several issues: (1) whether the District Parole Supervisor and Parole Board's imposition of a complete ban on J.I.'s use of an Internet-capable device was so

16

unnecessarily overbroad that it violated the statutory and regulatory scheme governing CSL offenders as well as constitutional norms; (2) whether J.I., as an offender subject to community supervision for life, possesses a protectible liberty interest in access to the Internet and a computer; and, if so, (3) whether J.I. was afforded the minimum requirements of due process before he was deprived of that liberty interest.

We begin with an overview of the important role the Internet plays in contemporary society and then turn to the general purposes of parole supervision and the statutory and regulatory scheme governing the imposition of Internet restrictions on CSL offenders.

IV.

Today, access to the Internet is considered to be a basic need and one of the most meaningful ways to participate in the essentials of everyday life. See Laura Tatelman, Note, Give Me Internet or Give Me Death: Analyzing the Constitutionality of Internet Restrictions as a Condition of Supervised Release for Child Pornography Offenders, 20 Cardozo J.L. & Gender 431, 442 (2014). Through email and social networks, the Internet has become a primary means of communication among family members and friends, coworkers, patients and their doctors, clients and their lawyers, and individuals seeking employment. See id. at 446, 450-51. Online, people engage in banking and business

17

transactions, purchase items, and watch movies and television. See Lori McPherson, The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future, 64 Drake L. Rev. 741, 789 (2016). The Internet provides access to newspapers, magazines, news networks and blogs, reference materials, and much of the world's literature. Voelker, supra, 489 F.3d at 145 & n.3. In 2012, the Internet surpassed radio and newspapers as a source of news for Americans and was poised to become more popular than television. Derek Thomas, Why the Internet Is About To Replace TV as the Most Important Source of News, The Atlantic (Oct. 1, 2012), http://www.theatlantic.com/business/archive/2012/10/why-the-internet-is-about-to-replace-tv-as-the-most-important-source-of-news/263100/. Most unemployed workers searching for jobs do so on the Internet, and millions of students take online classes. See Tatelman, supra, 20 Cardozo J.L. & Gender at 445–46. All in all, the Internet is a ubiquitous presence in contemporary life, and it is difficult "to imagine how [a person] could function in modern society given [a] lifetime ban on all forms of computer access and use." Voelker, supra, 489 F.3d at 148.

V.

A.

Sex offenders subject to community supervision for life, and parolees in general, are subject to "continued governmental

18

oversight and diminished personal autonomy when they are on parole or some other form of post-release supervision." J.B., supra, 433 N.J. Super. at 337. Although an offender on parole may face substantial restrictions not faced by the average citizen, the ultimate purpose of parole "is to help [offenders] reintegrate into society as constructive individuals." Morrissey v. Brewer, 408 U.S. 471, 477-78, 92 S. Ct. 2593, 2598, 33 L. Ed. 2d 484, 492 (1972). To that end, specific conditions restricting the activities of a CSL offender, including restrictions on Internet access, must bear a reasonable relationship to reducing the likelihood of recidivism and fostering public protection and rehabilitation. See N.J.S.A. 2C:43-6.4(b); N.J.S.A. 30:4-123.59(b)(1); see also Pazen v. N.J. State Parole Bd., 374 N.J. Super. 356, 367 (App. Div. 2005) (noting, in construing N.J.S.A. 30:4-123.59(b), "federal decisions . . . have rejected special conditions of parole where those conditions could not be justified as related to the rehabilitation of the parolee, the protection of society or the prevention of recidivistic behavior").

B.

One component of J.I.'s sentence was that he be subject to community supervision for life. See N.J.S.A. 2C:43-6.4. The State Parole Board's Division of Parole is responsible for the oversight and monitoring of CSL offenders. N.J.A.C. 10A:71-

19

6.11(b). CSL offenders are "supervised as if on parole and subject to <u>conditions appropriate to protect the public and foster rehabilitation</u>." <u>N.J.S.A.</u> 2C:43-6.4(b) (1994) (emphasis added) (amended 2003).[3] Those conditions are comprised of mandatory general conditions and permissive special conditions.[4]

The general and specific conditions of community supervision for life must be in writing and signed by the CSL offender at the time of his release from custody. <u>N.J.S.A.</u> 30:4-123.59(b); <u>see also</u> <u>N.J.A.C.</u> 10A:71-6.11(j). One of the general conditions of community supervision for life requires that a CSL offender "[r]efrain from using any computer and/or device to create any social networking profile or to access any social networking service or chat room in the offender's name or any other name for any reason unless expressly authorized by the District Parole Supervisor." <u>N.J.A.C.</u> 10A:71-6.11(b)(23).

In addition to the general CSL conditions, "the member or board panel certifying parole release . . . may impose any other specific conditions of parole deemed reasonable in order to

---

[3] The current version of <u>N.J.S.A.</u> 2C:43-6.4(b), although referring to offenders subject to parole supervision for life, requires -- as did the earlier version -- that the conditions of a "special sentence" be "appropriate to protect the public and foster rehabilitation."

[4] An offender who violates a specific or general condition of community supervision for life "is guilty of a crime of the third degree." <u>N.J.S.A.</u> 2C:43-6.4(d).

20

reduce the likelihood of recurrence of criminal or delinquent behavior, including a requirement that the parolee comply with the Internet access conditions set forth in [N.J.S.A. 30:4-123.59(b)(2)]." N.J.S.A. 30:4-123.59(b)(1); see also N.J.S.A. 2C:43-6.4(f)(1); N.J.A.C. 10A:71-6.4, -6.11(b). The setting of a specific condition must be "based on [the] prior history of the parolee or information provided by a victim." N.J.S.A. 30:4-123.59(b)(1). Requiring that a CSL offender's prior history inform the imposition of Internet special conditions ensures that those conditions bear a reasonable relationship to promoting public safety and fostering rehabilitation. Cf. N.J.S.A. 30:4-123.59(b)(2).

If the District Parole Supervisor decides to impose additional special conditions, he must give "written notice" to the CSL offender and to the Parole Board. Ibid. Importantly, "[a] special condition shall not be deemed effective until affirmed by the appropriate Board panel." N.J.A.C. 10A:71-6.11(k)(4). The Board panel is required to advise the District Parole Supervisor within three working days whether it has affirmed the imposition of the special condition. N.J.A.C. 10A:71-6.11(k)(2). The regulation does not provide the CSL offender with an opportunity to file a written submission to the Board panel. The three-day timeframe in which the Board panel must act on a proposed modification of a special CSL condition,

21

evidently, does not contemplate input from the CSL offender.

When appropriate, "the member or board panel certifying parole release" may set one or more of the following special conditions related to Internet access:

> (a) Prohibit the person from accessing or using a computer or any other device with Internet capability without the prior written approval of the court, except the person may use a computer or any other device with Internet capability in connection with that person's employment or search for employment with the prior approval of the person's parole officer;
>
> (b) Require the person to submit to periodic unannounced examinations of the person's computer or any other device with Internet capability . . . ;
>
> (c) Require the person to submit to the installation on the person's computer or device with Internet capability, at the person's expense, one or more hardware or software systems to monitor the Internet use; and
>
> (d) Require the person to submit to any other appropriate restrictions concerning the person's use or access of a computer or any other device with Internet capability.
>
> [N.J.S.A. 30:4-123.59(b)(2); see also N.J.S.A. 2C:43-6.4(f)(1).][5]

Subsections (b), (c), and (d) represent monitoring conditions to

---

[5] Except for minor differences, N.J.S.A. 2C:43-6.4(f) and N.J.S.A. 30:4-123.59(b)(2) are almost identical. N.J.S.A. 2C:43-6.4 speaks not only to the trial court's authority to impose special conditions, but also to the Parole Board's power to do so as well.

ensure that a CSL offender is using the Internet for legitimate purposes whereas subsection (a) represents a total ban on the use of any Internet-capable device for any purpose, subject to the employment exception at the discretion of the District Parole Supervisor.

The statute's structure, and common sense, suggests that Internet conditions should be tailored to the individual CSL offender, taking into account such factors as the underlying offense and any prior criminal history, whether the Internet was used as a tool to perpetrate the offense, the rehabilitative needs of the offender, and the imperative of public safety. Given the statute's list of optional Internet conditions, the Legislature evidently did not intend that a total ban on Internet use should be deployed when less restrictive alternatives can achieve the goal of public safety and personal rehabilitation.

VI.

A.

On September 19, 2012, J.I. signed a three-page form setting forth the general and specific conditions of his community supervision for life. The one condition on the CSL form relevant to this appeal is the social networking condition. It reads:

> I shall refrain from using any computer and/or

23

device to create any social networking profile or to access any social networking service or chat room (including but not limited to MySpace, Facebook, Match.com, Yahoo 360) in my name or any other name for any reason unless expressly authorized by the District Parole Supervisor.

In addition, J.I. acknowledged that he would "be subject to any special conditions . . . imposed by the District Parole Supervisor [and] affirmed by the appropriate Board panel." (Emphasis added).

At the time of J.I.'s second release from confinement, the social networking condition was the only restriction on his use of an Internet-capable device. A Deputy Attorney General confirmed that point with J.I.'s attorney by email. The District Parole Supervisor, therefore, was mistaken in his understanding that J.I. was never authorized to use the Internet upon his release. Although he indicated otherwise to J.I., the District Parole Supervisor had no power to impose restrictions orally or without the approval of a Board panel. Despite J.I.'s thirteen-month compliance with the Internet conditions attached to his CSL status, the District Parole Supervisor imposed dramatic restrictions after J.I. requested permission to access a professional networking site that he believed would improve his prospects for employment. As a result, J.I. went from full access to the Internet, subject to the social networking restriction, to no access to the Internet, except for employment

24

purposes.  The District Parole Supervisor did not point to any conduct during J.I.'s thirteen-month CSL period to justify the newly imposed restrictions.  Instead, he justified the Internet ban based on J.I.'s visiting pornography websites more than three years earlier.

With no apparent input from J.I., a Board panel affirmed the Internet ban except for employment purposes.  The timeline of events suggests that J.I.'s simple request for a relaxation of the social networking condition -- to allow access to LinkedIn -- set in motion the imposition of CSL conditions that banished him from nearly all of life's activities on the Internet.

J.I. appealed to the full Parole Board challenging the newly imposed special condition restricting his Internet access for employment purposes only.  He also requested a hearing.

Ultimately, the near-total ban was transformed into a complete Internet ban.  Before and after J.I. filed his administrative appeal, he visited the websites of his church, his therapist, and other seemingly benign websites.  Those websites were not employment related and therefore accessing them was in violation of the new special condition.  Thereafter, the parole authorities barred J.I. from using the Internet for any purpose -- including employment-related purposes -- and from possessing any Internet-capable device.  A Parole Board panel

25

and then the full Parole Board affirmed that decision.  The Board denied J.I.'s request for a hearing.

B.

Although the reasonableness of Internet restrictions imposed on a CSL offender is a novel issue for this Court, federal courts, such as the United States Court of Appeals for the Third Circuit, have addressed Internet restrictions on supervised offenders with some frequency.[6]  Although the federal statute dealing with supervised release, 18 U.S.C.A. § 3583, is worded differently from New Jersey's corollary CSL provisions, the principles governing the federal and state statutes are similar.  Under federal law -- as under state law -- "the primary purpose of supervised release is to facilitate the

---

[6] Pending before the United States Supreme Court is a constitutional challenge to a North Carolina criminal statute that prohibits sex offenders from accessing certain Internet websites.  Packingham v. North Carolina, __ U.S. ___, 137 S. Ct. 368, 196 L. Ed. 2d 283 (2016) (granting certiorari).  The North Carolina statute at issue makes it a crime for any registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages on the commercial social networking Web site."  State v. Packingham, 777 S.E.2d 738, 743-44 (N.C. 2015) (quoting N.C.G.S. § 14-202.5).  The North Carolina Court of Appeals held that the statute is "unconstitutional both on its face and as applied to defendant," but the North Carolina Supreme Court reversed, holding that the statute is "constitutional in all respects" and does not violate the First Amendment.  Id. at 741.  The criminal nature of the North Carolina statute distinguishes Packingham from the case before us.

integration of offenders back into the community rather than to punish them." Albertson, supra, 645 F.3d at 197 (citing U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 8-9 (2010)). Moreover, conditions of supervised release under federal law must be "reasonably related" to federal sentencing factors and must involve "no greater deprivation of liberty than is reasonably necessary" to fulfill the statute's purposes. Id. at 196-97 (citing United States v. Pruden, 398 F.3d 241, 248 (3d Cir. 2005)).

Although our state's supervised-release statutes are framed differently from their federal counterparts, nothing in the language of our statutes -- or in our jurisprudence -- suggests that CSL offenders may be subject to conditions that deprive them of their liberty when those conditions are not reasonably necessary to protect the public or foster their rehabilitation. To read our statutory scheme as allowing greater restrictions on the liberty of CSL offenders than are necessary would needlessly raise questions about its constitutionality. Accordingly, we may gain insight by reviewing how our sister federal courts address the imposition of Internet restrictions on sex offenders.

Third Circuit cases recognize that access to the Internet is "essential in modern life for legitimate purposes of communication, commerce, and information-gathering," United

27

States v. Miller, 594 F.3d 172, 185 (3d Cir. 2010), and therefore an Internet-access condition of "supervised release must be supported by some evidence that the condition imposed is tangibly related to the circumstances of the offense, the history of the defendant, the need for general deterrence," or similar penological concerns, ibid. (quoting Voelker, supra, 489 F.3d at 144).

The Third Circuit has upheld "a complete ban on internet access, except with prior approval of probation," when offenders "have used or have clearly demonstrated a willingness to use the internet as a direct instrument of physical harm." Albertson, supra, 645 F.3d at 197. It affirmed a ten-year total Internet ban when an offender used the Internet to encourage an "online chat companion to abuse sexually a minor girl in front of a webcam," id. at 197-98 (citing United States v. Thielemann, 575 F.3d 265, 268 (3d Cir. 2009), cert. denied, 558 U.S. 1133, 130 S. Ct. 1109, 175 L. Ed. 2d 291 (2010)), and a three-year total ban when an offender used the "internet to communicate, arrange to meet, and have sexual relations with a minor girl," id. at 198 (citing United States v. Crandon, 173 F.3d 122, 125 (3d Cir.), cert. denied, 528 U.S. 855, 120 S. Ct. 138, 145 L. Ed. 2d 118 (1999)).

In contrast, in cases where there was no direct link between Internet use and a "putative victim," the Third Circuit

28

has ruled that a "blanket ban" is overbroad. Ibid. (citation omitted). Thus, even in child pornography cases, the Third Circuit has declined to deny an offender "access to email or benign internet usage when a more focused restriction, limited to pornography sites and images, can be enforced by unannounced inspections of material stored on [the offender's] hard drive or removable disks." Ibid. (quoting Miller, supra, 594 F.3d at 186).

In Albertson, a case involving a defendant convicted of possession of child pornography on a home computer, the Third Circuit struck down a special condition barring the use of any Internet-capable computer as overbroad. Id. at 198-99. The circuit court did not minimize the serious harm caused by possessors of child pornography, but it determined that "inspections, coupled with the required installation of monitoring or filtering software, are reasonable methods of enforcing a more targeted internet restriction." Id. at 200. The Third Circuit concluded that "in a time where the daily necessities of life and work demand not only internet access but internet fluency, sentencing courts need to select the least restrictive alternative for achieving their sentencing purposes." Ibid. It therefore remanded to the district court to implement a more tailored scheme. Ibid.

C.

29

Informed by our statutory and regulatory scheme governing CSL offenders, and the federal cases cited, we cannot conclude that the Internet restrictions at issue were reasonably tailored to advance the goals of rehabilitation or public safety. J.I. did not use the Internet as a means of committing the offenses for which he was placed on community supervision for life. Although J.I., while on mandatory parole supervision, visited pornography websites sometime before January 7, 2010, the record does not suggest that he ever visited a pornographic or illicit website or used the Internet in any unlawful way after his ultimate release from the ADTC in October 2012. J.I. had been in compliance with his CSL conditions for thirteen months when the District Parole Supervisor and Parole Board panel imposed a near-total ban on Internet access. Only after the entry of that near-total ban did J.I. violate the Internet conditions by visiting benign websites, such as those of his church and therapist. We do not condone those violations because relief from overbroad or oppressive restrictions must be achieved through lawful means. A CSL offender must abide by the special conditions of his supervision unless and until relief is granted.

Nevertheless, we cannot ignore that the special conditions that have brought about this appeal were overbroad. Legitimate concerns about J.I.'s potential abuse of the Internet could have

30

been addressed through less restrictive means that were available under N.J.S.A. 30:4-123.59(b)(2)(b), (c), and (d). Under these sections, a CSL offender may be required "to submit to periodic unannounced examinations" of any Internet-capable device, N.J.S.A. 30:4-123.59(b)(2)(b); to install a software monitoring system at his own expense, N.J.S.A. 30:4-123.59(b)(2)(c); and to accede to any other "appropriate restrictions" concerning the use of an Internet-capable device, N.J.S.A. 30:4-123.59(b)(2)(d). Neither the District Parole Supervisor nor the Parole Board panel explained why those provisions were not acceptable alternatives to ensure public safety and the offender's rehabilitation before prohibiting J.I.'s access to the Internet for all purposes unrelated to employment.

Our review of the Parole Board's determination is deferential in light of its expertise in the specialized area of parole supervision, and we must uphold findings that are supported by credible evidence in the record. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002). Judicial review, however, requires that we not blindly defer to an agency's decision. See Brady v. Dep't of Pers., 149 N.J. 244, 256 (1997). The justification for Internet restrictions must be based on "more than the caprice of a parole officer." Jamgochian, supra, 196 N.J. at 246. The parole authorities do

31

not have unbridled discretion to impose unnecessary or oppressive Internet conditions that do not advance a rational penological policy. Arbitrary and unreasonable decisions of an administrative agency are not sustainable. See McGowan, supra, 347 N.J. Super. at 563.

The Internet condition imposed by the District Parole Supervisor in December 2013 denying J.I. access to the Internet for any purpose unrelated to employment was unreasonable because it was not tied to criminal conduct, rehabilitation, or public safety. Moreover, J.I.'s prior visits to pornographic websites and possession of pornographic material occurred before his re-incarceration and after he had complied for more than a year with his CSL terms. The Parole Board had available less restrictive alternatives than a complete Internet ban to achieve its mission.

Accordingly, the Internet condition placed on J.I. cannot be sustained on administrative law grounds.

VII.

We also conclude that J.I. was entitled to a reasonable opportunity to challenge the proposed imposition of the severely enhanced Internet restrictions, if only through written submissions to the Parole Board panel, and to a hearing in some form -- even if not an evidentiary one -- before the full Parole Board after the total Internet ban was imposed.

32

A CSL offender possesses protectible liberty interests, and the deprivation of such an interest implicates the minimal requirements of due process -- notice and an opportunity to be heard. See Jamgochian, supra, 196 N.J. at 239-41; see also Doe v. Poritz, 142 N.J. 1, 106 (1995). "[W]henever an individual risks governmental exposure to a 'grievous loss,'" even while under parole supervision, the right to due process attaches. State ex rel. D.G.W., 70 N.J. 488, 501-02 (1976) (quoting Morrissey, supra, 408 U.S. at 481, 92 S. Ct. at 2600, 33 L. Ed. 2d at 494).

In Jamgochian, supra, we held that a CSL offender was entitled to a Parole Board hearing to challenge the imposition of a seven-day-a-week, eleven-hour-a-day curfew that lasted sixteen months. 196 N.J. at 241, 250-51. We concluded -- after applying the balancing test set forth by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18, 33 (1976) -- that the enforced detention of a CSL offender in his own home, through a special parole condition imposed years after his release from prison, implicated a liberty interest triggering due process protections.[7] Jamgochian, supra, 196 N.J. at 240-41. A special

---

[7] In determining the "precise procedural protections mandated by due process in a particular case," we apply the three-factor test set forth in Mathews v. Eldridge:

condition of supervised release that totally banishes an offender from the Internet and prohibits his possession of any Internet-capable device arguably isolates him from society more thoroughly than a partial curfew and therefore equally implicates a liberty interest.

"Under the Mathews test, the individual's liberty interest and the value of added procedural protections must be balanced against the State's interest in maintaining a manageable parole system." Id. at 245. In Jamgochian, we acknowledged that the process due CSL offenders facing a curfew would depend on the circumstances of each case. Id. at 247. For example, we noted that "[a] curfew that is imposed immediately upon a supervised offender's release from prison may be distinguished from one imposed after the offender has lived in the community." Id. at 245 n.8. That is so because "[a] curfew imposed after an

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> [Jamgochian, supra, 196 N.J. at 240 (alteration in original) (quoting Mathews, supra, 424 U.S. at 335, 96 S. Ct. at 903, 47 L. Ed. 2d at 33).]

offender has lived freely in society for some period of time must be related to conduct engaged in by the offender after his release." Ibid. That point is apposite here because J.I. complied for thirteen months with the Internet conditions set on his release date, and the Parole District Supervisor justified imposing extreme restrictions based on conduct that predated his release.

We also recognized in Jamgochian that the Parole Board was authorized to impose a curfew on an emergent basis to ensure public safety before affording a CSL offender a hearing. Id. at 247. That same principle holds true concerning an Internet ban. The case before us, however, did not present any exigency that required the delay of J.I.'s right to be heard in some meaningful way before imposition of the near-total ban.

Because "due process is a flexible concept," the level of process required will depend on a number of variables, including the timing of and justification for the Internet restriction, the severity and length of the restriction, whether facts are contested or uncontested, and whether credibility determinations must be made. See ibid. Requiring certain procedural protections to guard against the erroneous deprivation of a supervised offender's liberty interest necessarily places an additional burden on the Parole Board. Id. at 246. Although we require process to safeguard against arbitrary government

35

action, we will not mandate a regime that makes it impractical to impose an Internet restriction to protect the public or rehabilitate an offender.  See ibid.

As a point of reference, it bears noting that regular parolees are provided with the opportunity to submit written comments within fifteen days to a Board panel on an application to modify a condition of their parole.  N.J.A.C. 10A:71-6.6(e).  The panel has forty-five days from receipt of an application to render a decision.  N.J.A.C. 10A:71-6.6(f).  The process afforded to regular parolees appears to exceed that provided to CSL offenders, who do not have a similar opportunity to provide written submissions to the Board panel reviewing their conditions.  Indeed, in the case of a CSL offender, the panel is required to act within three working days of a District Parole Supervisor's decision.  N.J.A.C. 10A:71-6.11(k)(2).

"[T]he balance of interests weighs in favor of giving a supervised offender the opportunity to respond in a meaningful way to" a near-total or absolute Internet ban imposed more than a year after the offender's release from confinement.  See Jamgochian, supra, 196 N.J. at 246.  In the case of a Board panel's review of a District Parole Supervisor's imposition of stringent Internet restrictions, as here, due process will be satisfied by allowing the CSL offender "the opportunity to respond by letter with supporting attachments, such as

36

certifications or affidavits." See id. at 247. The regulation, as written, does not contemplate input from the CSL offender. Allowing a CSL offender ten or fifteen days to file a written submission to a Board panel challenging a District Parole Supervisor's modification of an Internet condition is a sensible accommodation to ensure the due process rights of a CSL offender are consonant with the Parole Board's regulatory scheme.

Now, we address the process necessary before the full Parole Board in the case before us. J.I. is presently banned from having any access to the Internet and is threatened with arrest if he is in possession of an Internet-capable device. The absolute restriction on J.I.'s access to the Internet may undermine his rehabilitation and hinder his ability to succeed as a free agent in society. Although J.I. has not alleged any factual disputes in the record that would suggest the need for an evidentiary hearing, he is able to submit certifications from his therapist and other relevant sources to the Board's attention. The circumstances of this case, however, call for more process. Those circumstances include the fact that the parole authorities imposed more restrictive Internet conditions -- amounting to a near-total ban -- after J.I. had been compliant with his CSL conditions for thirteen months and that J.I.'s underlying conviction was unrelated to the Internet. J.I., personally and/or through his attorney, must be given an

37

opportunity to appear before the Board and be heard.  The additional process will not impose an undue administrative burden, and it may reduce the potential for an erroneous deprivation of a liberty interest.

In the end, the additional process will serve the interests of both the Parole Board and J.I., for neither will benefit if a District Parole Supervisor arbitrarily and unreasonably imposed a near-total or absolute Internet ban.

## VIII.

For the reasons expressed, we reverse the Appellate Division and remand to the Parole Board for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN'S opinion.