# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2022-18T2
A-2024-18T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

R.K.,

      Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**April 27, 2020**

**APPELLATE DIVISION**

Argued January 13, 2020 – Decided April 27, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment Nos. 99-08-0439 and 12-05-0377.

Stephanie A. Lutz, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephanie A. Lutz, of counsel and on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Steven A. Yomtov, of counsel and on the briefs).

The opinion of the court was delivered by

SUMNERS, JR., J.A.D.

These consolidated appeals require us to determine whether two sentences imposed on convicted sexual offender R.K.[1] for violating a New Jersey Parole Board (Board) regulation imposing a supervised release condition banning the use of the Internet to access social media[2] are unconstitutional. R.K. contends the condition is unconstitutional on its face and as applied to him.[3] The trial court denied R.K.'s motions to correct his illegal sentences, finding the ban did not violate R.K.'s constitutional rights. Because we conclude the blanket social media prohibition is both unconstitutional on its face and as applied to R.K. individually, R.K.'s sentences impede his free speech rights, and we reverse and remand for further proceedings consistent with this decision.

---

[1] In accordance with our order of January 28, 2020 granting appellant's motion, we use appellant's initials.

[2] We use the words "social networking" and "social media" interchangeably, recognizing that the terms reference the same types of Internet-based content and are not vague terms. See K.G. v. N.J. State Parole Bd., 458 N.J. Super. 1 (App. Div. 2019).

[3] On its own motion, the court ordered R.K.'s two separate appeals consolidated for all purposes as they share common facts and issues.

I.

We begin with a discussion of the facts and procedural history pertinent to this appeal.

R.K.'s Previous Convictions[4]

In October 1999, R.K. pled guilty to fourth-degree lewdness and third-degree endangering the welfare of a child, both in violation of N.J.S.A. 2C:14-4(a). About four months earlier, R.K., twenty-six years old at the time, approached two fourteen-year-old girls, asked them for sex, and exposed his penis. At his sentencing in June 2000, he was given a time-served sentence, three years' probation, and placed on Community Supervision for Life (CSL). His sentence also banned him from contacting minors. N.J.A.C. 10A:71-6.11(c).

In February 2004, R.K. was re-sentenced to four years in prison for violating probation. After a second parole violation in 2005, he was sentenced to four years at the Adult Diagnostic and Treatment Center.

---

[4] The record details R.K.'s convictions for other offenses not relevant to this appeal. Thus, we do not discuss them.

In 2007, the Board added a new CSL special condition to R.K.'s parole, as it did with all other individuals serving a CSL sentence. Signing the Board's acknowledgement form, R.K. understood he was now prohibited from using social media on the Internet without the express authorization of the District Parole Supervisor.[5] As we detail later, this prohibition was codified in N.J.A.C. 10A:71-6.11(b)(23) ("the social networking ban").

On May 12, 2011, R.K. was notified he was also "prohibited from accessing [on the Internet] any sexually-oriented websites, material, information or data." This new special condition recited: "Sexually oriented materials means any picture, photograph, negative, film, movie, videotape, DVD, CD, CD-ROM, streaming video, computer generated or virtual image or other representation,

---

[5] R.K. acknowledged:

> I shall refrain from using any computer and/or device to create any social networking profile or to access any social networking service or chat room (including but not limited to MySpace, Facebook, Match.com, Yahoo 360) in my own name or any other name for any reason unless, expressly authorized by the District Parole Supervisor.

4

publication, sound recording or live performance, that contains a description or depiction of actual or simulated acts such as, but not limited to, sexual intercourse, oral sex, anal sex, masturbation, bestiality, sadism or masochism." The condition was instituted due to R.K.'s polygraph examination a month earlier when he "admitted to using his cell phone and public computers to search [Craigslist.org (Craigslist)][6] and solicit prostitutes."  According to the Board, "[i]mposition of this condition . . . [was to] strengthen relapse prevention/safety plan and prevent [R.K.] from deleting/modifying any Internet history."

R.K.'s Violation of the Social Networking Ban

On April 12, 2012, R.K.'s parole officer made an unscheduled inspection at R.K.'s job and examined the Internet history and personal messages on R.K.'s cell phone.  The inspection revealed R.K. had accessed, what the parole officer's report termed, a "dating site" by visiting Craigslist and had "responded to several personal/dating ads on that website."  Additionally, the report noted R.K. had

---

[6] Craigslist.org is a website which provides a forum for posting classified ads in areas such as "for sale", "housing", "jobs", and "discussion forums" across at least 71 countries and in all 50 U.S. states.  CRAIGSLIST, https://www.craigslist.org/about/sites (last visited Mar. 24, 2020).  In 2009, Wired Magazine reported Craigslist had "47 million unique users every month in the US alone. . . ."  Why Craigslist Is Such a Mess, WIRED, August 24, 2009 (https://www.wired.com/2009/08/ff-craigslist/).

directly messaged four women who had posted personal ads on the website. Several screenshots were taken by the parole officer documenting the five ads visited by R.K. and two email direct message conversations. The ads were posted by adult women looking for varying forms of relationships and having "fun" together, without any direct suggestion of sex. Three even mentioned a desire to marry or find a husband. The direct message conversations suggested mutual picture exchanges between R.K. and the women to verify the legitimacy of the posts.

Thereafter, R.K. was charged with "knowingly violat[ing] his [CSL] sentence by using his [cellphone] to create a social networking profile and/or to access any social networking service, site or chat room" in violation of N.J.S.A. 2C:43-6.4(d), a fourth-degree crime. He pled guilty on September 14, 2012, and four months later, he was sentenced to 364 days in county jail.

R.K.'s Motion to Correct Sentences

Almost six years after his conviction for violating the social networking ban, R.K. filed two separate motions to correct sentences not authorized by law. R.K. argued both the social networking restriction added to his June 2000 sentence related to his guilty plea in October 1999 and his 2012 CSL violation of those restrictions for accessing the Craigslist website, violated his rights

6

under the First Amendment of the United States Constitution and Article I, Paragraphs 6 and 18 of the New Jersey Constitution because the restrictions are overbroad, vague, and criminalize his protected free speech. In the alternative, R.K. argued the restrictions are unconstitutional as applied to him. The State opposed the motion.

On December 13, 2018, the trial court entered an order, together with a fourteen-page written decision, denying R.K.'s motions. Citing J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327, 342, 344 (App. Div.), certif. denied, B.M. v. N.J. State Parole Bd., 217 N.J. 296 (2014) ("J.B. I"), the court determined the social networking ban had already been ruled facially constitutional because the Board "balance[d] the important safety interests at stake with the offenders' interests in free expression and association."

The trial court rejected R.K.'s reliance on Packingham v. North Carolina, 582 U.S. ___, 137 S. Ct. 1730 (2017), which found a North Carolina statute making it a criminal offense for convicted sex offenders to access social media unconstitutional because it violated their first amendment rights. The court reasoned the social networking ban on R.K. involved a supervised release parole condition imposed through a regulation as opposed to the criminal statute restrictions struck down in Packingham, 137 S. Ct. at 1731. See also State v.

Hester, 233 N.J., 381, 388 (2018); J.I. v. N.J. State Parole Bd., 228 N.J. 204, 216, 226 n.6 (2017).

In finding the social networking ban constitutional as applied to R.K., the trial court stated he was never "prevented from or penalized for accessing general websites such as Amazon.com or WebMD.com" as he argued, nor was he subject to the complete Internet ban struck down in J.I., 228 N.J. at 210. The court relied on the combined holdings in State v. Perez, 220 N.J. 423, 437 (2015), Hester, 233 N.J. at 387, and J.B. v. N.J. State Parole Bd., 229 N.J. 21, 41 (2017) ("J.B. II"), to maintain that individuals on CSL may have their constitutional freedoms limited, since they are "supervised as if on parole," with "conditions appropriate to protect the public and foster rehabilitation." While acknowledging under J.I. a full Internet ban is unlawful, the court found a social networking restriction lawful. 228 N.J. at 210.

Finally, the trial court found R.K.'s conviction for violating his CSL in 2012 "fully justified by a particular term of [R.K.'s] CSL separate and apart from the [social networking ban]." The court determined the CSL's sexually-oriented material ban was explicitly justified and applied solely to R.K., not for his underlying crime but for his "past history of soliciting prostitutes online and otherwise continuing to respond to personal advertisements."

The court held all the imposed bans were properly executed with sufficient notification to R.K., and it was his continued access of dating websites and responses to personal ads that led to a legal parole violation conviction. In sum, the court found the social networking ban facially constitutional and constitutional as applied to R.K, thus making legal his sentences placing him on CSL in June 2000 and for his 2012 CSL violation.

## II.

### A.

Before us, R.K. challenges the constitutionality of the CSL's social networking ban terms for being overbroad, vague and unconstitutional as applied to him. Relying on Packingham, 137 S. Ct. at 1736, he asserts the ban must be "narrowly tailored to serve a significant government interest, that is, it must not burden substantially more speech than is necessary to further the government's legitimate interests." Because the ban uniformly applies to all individuals subject to CSL sentences, R.K. contends there is no prior appropriate consideration of a sex offender's individual offense or rehabilitative needs as prescribed by J.I. R.K. argues access to social networking based upon the approval of the District Parole Supervisor makes the statute overbroad and unconstitutional because "the exercise of constitutionally protected conduct

depends on . . . [the supervisor's] own subjective views as to the propriety of the conduct." State v. Lashinsky, 81 N.J. 1, 16 (1979). Finally, he asserts the social networking ban's language is unconstitutionally vague because the prohibited conduct is not precisely defined as required in In re Hinds, 90 N.J. 604, 617 (1982) (quoting Cramp v. Bd. of Pub. Instruction, 368 U.S. 278, 286 (1961) ("To avoid the potential chilling effect on free speech rights, the regulation must be in 'terms susceptible of objective measurement.'")).

Alternatively, R.K. submits even if the ban is facially constitutional, it is unconstitutional as applied to him. Citing Packingham, J.I., and K.G., he contends his CSL terms, including the general provision banning access to social networks, is not tailored to him because the Board failed to consider his: (1) underlying offense; (2) prior criminal history; (3) use of the Internet in facilitating offenses; (4) rehabilitative needs; and (5) threat to public safety. K.G., 458 N.J. Super. at 35. R.K. asserts the underlying offenses for his CSL sentence—lewdness and endangering the welfare of a minor—were not facilitated by the Internet, nor were any of his other convictions. Additionally, he claims, under N.J.A.C. 10A:71-6.11(c), he is already prevented from contacting minors online, so the social networking ban is overly restrictive and unnecessary.

Arguing the social networking ban is facially unconstitutional or has been unconstitutionality applied to him, R.K. maintains his sentences were illegal and should be vacated, or at the least, he requests permission to withdraw his guilty pleas to correct a manifest injustice.

B.

The State contends the social networking ban is constitutionally sound under Packingham, which does not apply to R.K.'s sentences because they were conditions for a supervised-release sentence, and the social networking ban has an escape valve through which the District Parole Supervisor's approval authority allows for a more measured approach that does not amount to a complete ban. The State relies on three cases holding that Packingham is limited to supervised-release sentences: United States v. Rock, 863 F.3d 827, 831 (D.C.

11

Cir. 2017), United States v. Halverson, 897 F.3d 645 (5th Cir. 2018), and People v. Morger, 2018 IL App (4th) 170285 ("Morger I").[7]

The State argues under our decision in J.B. I, the social networking ban is constitutional on its face and any lingering constitutional disputes are limited to as-applied challenges. Additionally, the State argues R.K. "did not exhaust [the] 'procedural avenue' of seeking permission from his parole officer for access to a particular website; . . . [then] if denied, bring an 'as[-]applied' constitutional challenge as set forth in [J.B. I]." As to the latter assertion, the State contends "Internet restrictions" are not unconstitutional or unlawful as applied to R.K. because they were justified by his admitted history of using Craigslist "to solicit prostitutes and respond[] to personal advertisements on a dating website – both of which were forbidden."

---

[7] After the initial briefs were filed, the Illinois Supreme Court, applying the "tenets of Packingham" in People v. Morger, 2019 IL 123643 ("Morger II"), affirmed in part and reversed in part Morger I. The Court concluded that banning probationers, including the defendant, from accessing social media after being convicted of aggravated criminal sexual abuse and criminal sexual abuse, was overbroad and facially unconstitutional because the ban was absolute by including those who never used the Internet and social media to commit their offenses. Id. at ¶ 58. In accordance with Rule 2:6-11(d), R.K. brought Morger II to our attention.

The State continues, asserting that J.I.'s complete ban on Internet access is distinguishable from R.K.'s situation. First, J.I. addressed a condition which applied to an individual offender's CSL sentence not to all individuals on CSL. Second, the ban in J.I. was a total ban on Internet access, which is not the case here. Third, the State argues the social networking restrictions are also justified by the explicit reason given for R.K.'s specific ban on sexually oriented material, considering R.K.'s admission to illegal behavior and high-risk activities such as using Craigslist to search and solicit prostitutes. Thus, the social networking ban is warranted and is not arbitrary, unreasonable, or more restrictive than necessary as enforced against R.K.

### III.

Before addressing the constitutionality of the social networking ban, we must briefly review the principles governing a motion to correct an illegal sentence, the Board's overall goal of CSL parole supervision, and the methods the Board used to impose Internet restrictions on R.K.

### A.

An illegal sentence is one that is contrary to the Code of Criminal Justice or constitutional principles. State v. Acevedo, 205 N.J. 40, 45 (2011); State v. Veney, 327 N.J. Super. 458, 462 (App. Div. 2000) (citing State v. Flores, 228

13

N.J. Super. 586, 591-92 (App. Div. 1988)).  An illegal sentence may be corrected at any time so long as the sentence has not been completely served.  State v. Schubert, 212 N.J. 295, 309 (2012).  Because a trial court's determination of whether a sentence is constitutional is a legal question, our review is de novo. State v. Drake, 444 N.J. Super. 265, 271 (App. Div. 2016).

B.

CSL is a "component" of Megan's Law, which "has its statutory source in N.J.S.A. 2C:43-6.4, the Violent Predator Incapacitation Act."  Schubert, 212 N.J. at 305.  For specific offenses, N.J.S.A. 2C:43-6.4(a) mandates a trial court impose CSL, in addition to the sentence required under the Code of Criminal Justice, in order "to protect the public from recidivism by sexual offenders." State v. Perez, 220 N.J. 423, 437 (2015); see also J.I. 228 N.J. at 221.  The Board has broad authority to impose conditions, so long as the conditions are "deemed reasonable in order to reduce the likelihood of recurrence of criminal or delinquent behavior."  N.J.S.A. 30:4-123.59(b)(1).  Sex offenders "subject to CSL are supervised by the . . . Board and face a variety of conditions beyond those imposed on non-sex-offender parolees."  Perez, 220 N.J. at 437 (citing N.J.A.C. 10A:71-6.11).

## C.

In 2010, the Board enacted the social networking ban, a regulation which provides all sexual offenders on CSL shall:

> Refrain from using any computer and/or device to create any social networking profile or to access any social networking service or chat room in the offender's name or any other name for any reason unless expressly authorized by the District Parole Supervisor.
>
> [N.J.A.C. 10A:71-6.11(b)(23).]

After this provision, in several sub-points, the regulation delineates what constitutes "social networking service" or "chat room":

> iv. "Social networking service," as used in this paragraph, includes any Internet website or application, chat room, or peer-to-peer network, that:
>
> (1) Contains profile pages of the members of the social networking service that include the names or nicknames of such members, photographs placed on the profile pages by such members, or any other personal or personally identifying information about such members and links to other profile pages on social networking service of friends or associates of such members that can be accessed by other members of or visitors to the social networking service;
>
> (2) Provides members of or visitors to such social networking service the ability to leave messages or

comments on the profile page that are visible to all or some visitors to the profile page;

(3) Provides members of or visitors to the social networking service the ability to engage in direct or real time communication with other users, such as a chat room or instant messenger; or

(4) Provides a form of electronic mail for members or visitors to the social networking service. For the purpose of this definition, social networking service does not include the use of e-mail exclusively for person to person communication.

[N.J.A.C. 10A:71-6.11(b)(23)(iv)(1)-(4).]

A person who violates these CSL conditions is subject to the same regulations for which the Board supervises all parolees. N.J.A.C. 10A:71-6.11(b).

IV.

A.

The first step of a facial challenge to a law on the basis of overbreadth and vagueness is determining whether the enactment reaches a substantial amount of constitutionally protected conduct. Town Tobacconist v. Kimmelman, 94 N.J. 85, 98 (1983) (quoting Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 494-95 (1982)). The challenge fails if the law does not. Ibid. "The concept of overbreadth . . . rests on principles of substantive due process

16

which forbid the prohibition of certain individual [constitutional] freedoms." Lashinsky, 81 N.J. at 16 (quoting Landry v. Daley, 280 F. Supp. 938, 951-52 (N.D. Ill. 1968)). The issue "'is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far. The evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests.'" State v. Wright, 235 N.J. Super. 97, 103 (App. Div. 1989) (quoting Town Tobacconist, 94 N.J. at 125 n.21). Yet, "whenever possible, [courts] should avoid interpreting a legislative enactment in a way that would render it unconstitutional." State v. Fortin, 198 N.J. 619, 630 (2009).

To determine whether a law is void for vagueness, one must decide "if it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 181 (1999) (quotations omitted). However, "[t]he vagueness doctrine requires that laws that impose criminal penalties or impede First Amendment interests be strictly scrutinized." Id. at 182. This includes an assessment of CSL special conditions. Pazden v. N.J. State Parole Bd., 374 N.J. Super. 356, 370 (App. Div. 2005). But a regulation may use "broad terms, provided it is controlled by a sufficient basic norm or standard. It need not be

minutely detailed to cover every possible situation." Karins v. City of Atl. City, 152 N.J. 532, 542 (1998) (citations omitted). "The vagueness doctrine requires that laws that impose criminal penalties or impede First Amendment interests be strictly scrutinized." Ibid. (citations omitted).

B.

Addressing R.K.'s vagueness argument first, this court recently concluded the definition of "social networking service" provided in N.J.A.C. 10A:71-6.11(b)(23)(iv) to be detailed enough to avoid the void-for-vagueness standard. K.G., 458 N.J. Super. at 43 (finding the term was "controlled by a sufficient basic norm or standard"). Thus, the argument that the regulation is unconstitutionally vague on its face is without merit.

As for R.K.'s argument that the social networking ban is unconstitutional as overbroad, it requires a more robust analysis. We start with a review of pre-Packingham decisions by this court, then Packingham, followed by Packingham's application in several other jurisdictions and its brief discussion in our courts.

Pre-Packingham

Prior to Packingham, this court in J.B. I rejected four convicted sex offenders' challenges that the social media ban imposed on their supervised-

18

release CSL sentences was facially unconstitutional under the First Amendment. 433 N.J. Super. at 330. Citing decisions in other jurisdictions, including United States v. Love, 593 F.3d 1, 11-13 (D.C. Cir. 2010) and United States v. Crandon, 173 F.3d 122 (3d Cir. 1999), we determined the ban was "legitimately aimed at restricting such offenders from participating in unwholesome interactive discussions on the Internet with children or strangers who might fall prey to their potential recidivist behavior . . ." and not to "bar appellants from having Internet access to news, entertainment, and commercial transactions." J.B. I, 433 N.J. Super. at 341-42. Recognizing that even though some websites had uses other than "interactive communications with third parties," we concluded the Board "reasonably attempted to draw the line of permitted access in a fair manner that balances the important public safety interests at stake with the offenders' interests in free expression and association." Ibid. Guided by the principle that facial challenges are used "sparingly and only as last resort[,]" this court suggested it was more sensible to "decline to strike down a law on its face, and instead reserve claims of unconstitutionality for future as-applied litigation." Id. at 345-46.

Some three years after J.B. I, and three months before Packingham, our Supreme Court decided J.I., which reversed the decisions of a District Parole

Supervisor and the Board's employment of the social networking ban in denying the defendant the right to possess any Internet-capable device after he had violated a ban on Internet access except for employment purposes. J.I., 288 N.J. at 210. The Court stated:

> Conditions imposed on CSL offenders—like those imposed on regular parolees—are intended to promote public safety, reduce recidivism, and foster the offender's reintegration into society. Arbitrarily imposed Internet restrictions that are not tethered to those objectives are inconsistent with the administrative regime governing CSL offenders. We agree with the position taken by federal courts that Internet conditions attached to the supervised release of sex offenders should not be more restrictive than necessary.
>
> The sheer breadth of the initial near-total Internet ban . . . cannot be easily justified, particularly given the availability of less restrictive options . . . . The complete denial of access to the Internet implicates a liberty interest, which in turn triggers due process concerns.
>
> [Id. at 211.]

It appears the Court distinguished our ruling in J.B. I, by noting that there, the Board restricted "particular websites or social networks," but in J.I. the restriction was a "total ban on Internet access . . . ." Id. at 217. In support of its decision, the Court acknowledged the growing use of the internet as a "basic

need and one of the most meaningful ways to participate in the essentials of everyday life." Id. at 220. The Court stated sex offenders on parole "face substantial restrictions not faced by the average citizen" but, "conditions restricting the activities of a CSL offender, including restrictions on Internet access, must bear a reasonable relationship to reducing the likelihood of recidivism and fostering public protection and rehabilitation." Id. at 221.

Packingham

In Packingham, the defendant sex offender in North Carolina was subject to a state statute making it a felony "'to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages.'" 137 S. Ct. at 1730 (citing N. C. GEN. STAT. ANN. §§14-202.5(a), (e) (2015)). Eight years after his conviction, an investigation led to the defendant's indictment for using Facebook in violation of the statute.[8] Id. at 1734. His motion to dismiss the indictment on the grounds that the law violated the First Amendment was denied by the trial court and he was subsequently convicted. Ibid. The United States

---

[8] Defendant using an alias, praised God on a Facebook post for the dismissal of a traffic ticket against him. Packingham, 137 S. Ct. at 1731-32.

Supreme Court granted certiorari after the Court of Appeals of North Carolina affirmed the conviction "concluding the law is 'constitutional in all respects.'" Id. at 1735 (citing State v. Packingham, 777 S. E. 2d 738, 741 (N.C. 2015)).

In a unanimous opinion, the Supreme Court reversed the North Carolina high court, concluding the law unconstitutional under the First Amendment. Justice Kennedy, writing for the Court, recognized that unfortunately modern technology, such as the Internet and social networking, has followed the trajectory of other advancements, such as the railroad and telephone, by being exploited for criminal purposes. Id. at 1736. The Court was clear in noting child sexual abuse is a repugnant and serious crime for which our legislatures have the right to pass laws to protect children as well as others from being victimized. Id. at 1732 (citing Ashcroft v. Free Speech Coal., 535 U.S. 234, 244 (2002)). "But the assertion of a valid governmental interest 'cannot, in every context, be insulated from all constitutional protections.'" Ibid. (quoting Stanley v. Georgia, 394 U.S. 557, 563 (1969)).

Pointing out social networking on the Internet acted as a democratic forum for communication and expression, the Court assumed the statute was content neutral and applied intermediate scrutiny looking for the law to be "narrowly tailored to serve a significant governmental interest . . . ." and "not burden

substantially more speech than necessary to further the government's legitimate interests." Id. at 1732 (quoting McCullen v. Coakley, 573 U.S. 464, 466 (2014)) (internal citations omitted) (quoting Reno v. American Civil Liberties Union, 521 U.S. 844, 868 (1997)).[9] In analyzing the North Carolina statute's social media prohibition, the Supreme Court held:

> to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.
>
> [Id. at 1737.]

---

[9] Commenting on the opinion, a prominent treatise on U.S. Constitutional law updated its section on the 'regulation of speech by context' to include, "[t]he internet and access to social media have also been recognized as public forums where First Amendment protection applies." 2 William J. Rich, MODERN CONSTITUTIONAL LAW 274 (West, 3rd ed. 2011 & Supp. 2019-2020) (citing Packingham, 137 S. Ct. at 1731).

The Court in Packingham held the North Carolina ban was too broad and could encompass access "not only to commonplace social media websites but also to websites as varied as Amazon.com, Washingtonpost.com, and WebMD.com." Id. at 1736. Relying on Ashcroft, 535 U.S. at 255, the Court concluded it was well established that suppression of lawful speech in order to suppress unlawful speech was not lawful. Id. at 1738. Yet, it specifically left open the "enact[ment] [of] more specific laws than the [North Carolina ban]." In dicta, Justice Kennedy suggested the State can enact laws prohibiting conduct which often "presages a sexual crime, like contacting a minor or using a website to gather information about a minor." Id. at 1732. In his concurring opinion, Justice Alito remarked that the plain reading of the statute, creates a "fatal problem[,] . . . [because] its wide sweep precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child." Packingham, 137 S. Ct. at 1741 (Alito, J., concurring).

Post-Packingham

The Second and Third Circuits of the United States Court of Appeals subsequently applied Packingham to strike down Internet restrictions for supervised release parolees. R.K. cites these rulings in support of his position.

In United States v. Holena, 906 F.3d 288, 290 (3d Cir. 2018), the defendant was convicted of the federal crime of using the Internet to try to entice a child into having sex and was banned from using the Internet. The Third Circuit held "[a] complete ban on computer and internet use will rarely be sufficiently tailored." Id. at 290 (citing United States v. Albertson, 645 F.3d 191, 197 (3d Cir. 2011)). The conditions of supervised release banning total Internet access by sex offenders generally, not specifically restricting social networking site access, were determined to have the same 'fatal flaw' as the North Carolina criminal statute in Packingham because of the vast number of Internet websites bearing no connection with the underlying crimes committed by the sex offenders. Id. at 295. The court held supervised release "restrictions on [the defendant's] speech are not making the public safer." Id. at 294.

In United States v. Eaglin, 913 F.3d 88, 91 (2d Cir. 2019), the defendant was convicted under a New Hampshire law for having sexual relationships with two thirteen-year-old girls when he was twenty-one and twenty-two years old, and was banned from using the Internet as part of his supervised release. The Fourth Circuit held prohibiting the defendant from going on websites violated his free speech rights "to email, blog, and discuss the issues of the day on the Internet while he is on supervised release." Id. at 96.

R.K. also cites to other jurisdictions which have similarly applied Packingham to vacate supervised released conditions banning the total use of the Internet. See Manning v. Powers, 281 F. Supp. 3d 953 (C.D. Cal. 2017) (holding a social media ban as a condition for the parolee was a "sweeping prohibition" which violated the parolee's right to freedom of speech); United States v. Maxson, 281 F. Supp. 3d 594 (D. Md. 2017) (finding a condition that requires a probation officer's approval for a parolee to access the internet does not negate the overbroad nature of the restriction as the ban was not tailored to the defendant's criminal conduct); Mutter v. Ross, 811 S.E.2d 866 (W. Va. 2018) (holding that a supervised-release condition prohibiting internet access violated the First Amendment when the parolee did not use the internet to perpetrate the underlying sex offense); Jennings v. Commonwealth, No. 2018-CA-000061-MR, 2019 Ky. App. LEXIS 64 (Ky. Ct. App. Apr. 12, 2019) (explaining the probation condition banning total access to the internet was overly broad and unconstitutionally vague for a defendant who could successfully rehabilitate

without an internet ban);[10] and State v. Cutshall, 906 N.W.2d 205 (Iowa Ct. App. 2017) (discussing the unreasonableness of the internet restriction given the defendant did not use the Internet in the underlying offense).

To the contrary, the State argues we should rely on rulings by the D.C. and Fifth Circuits concluding Packingham is inapplicable to supervised-release conditions such as R.K.'s situation.

In United States v. Rock, 863 F.3d 827, 831 (D.C. Cir. 2017), a supervised release condition prohibited the defendant from possessing or using a computer or having access to any online service without approval of the probation office following his guilty plea for distribution of child pornography through the Internet. The defendant installed digital cameras in an eleven-year-old girl's room and shared still photographs taken from those cameras in an online chat

---

[10] Based on Kentucky Court Rule 76.30(2)(d) no decision is final when it is pending review. Decisions by the Kentucky Appellate Division which are designated to be published remain unpublished in this status until a final decision is rendered. The Kentucky Supreme Court has granted a motion for discretionary review of Jennings. Commonwealth v. Jennings, No. 2019-SC-000248-D, 2019 Ky. LEXIS 417 (Oct. 24, 2019) ("Jennings II"). Thus, Jennings is not a final decision because of this review. Under Kentucky Court Rule 76.28(4)(c), parties and judges can cite these decisions "for consideration . . . if there is no published authority that would adequately address the issue before the Court."

room and solicited an online streamed rape of a twelve-year-old girl. Id. at 829. Defendant's ban was applied solely to him and not a ban on all sex offenders. Ibid. The D.C. Circuit upheld the condition because it was "imposed as part of his supervised-release sentence, and [was] not a post-custodial restriction of the sort imposed on Packingham." Ibid. (citing Packingham, 137 S. Ct. at 1734, 1736).

In United States v. Halverson, 897 F.3d 645, 649 (5th Cir. 2018), after the defendant pled guilty to possession of child pornography, citing Packingham, he challenged the lifetime supervised release condition banning him from subscribing to any computer online service or accessing the Internet unless first approved in writing by his probation officer. The court distinguished the defendant's situation from Packingham, by holding Packingham "does not apply to a supervised-release condition, because such a condition 'is not a post-custodial restriction of the sort imposed on Packingham.'" Id. at 658 (quoting Rock, 863 F. 3d at 831). As in Rock, the defendant committed his crime using a computer with Internet access. 863 F. 3d at 829.

C.

We agree with the State that the situation in Packingham involving a criminal statute's ban on sex offenders' blanket use of the Internet differs from

28

the supervised released social networking restriction imposed here – first by the Board and later codified in regulation as the social networking ban. In fact, we recently acknowledged this in K.G., a consolidated opinion involving four convicted sex offenders challenging supervised release condition sentences restricting their Internet use, noting: "Although Packingham is not on point because that case dealt with a criminal statute affecting registered sex offenders who were not on parole, the [United States Supreme] Court recognized significant First Amendment interests in access to social-networking websites." 458 N.J. Super. at 36 n.13. However, we now conclude the logic expressed by the Supreme Court in Packingham applies to the social networking ban automatically imposed on new CSL sentences and as a CSL condition of R.K.'s supervised release, making illegal the sentences imposed on R.K. for violating the CSL conditions.

As the Second and Third Circuits persuasively held in Holena and Eaglin, respectively, we envision the same constitutional flaw on an outright Internet ban whether it is imposed by a criminal statute as in Packingham or by a supervised release condition imposed by the Board's regulation as is the case here. In doing so, we do not find persuasive, as the State argues, the positions articulated by the D.C. and Fifth Circuits, in Rock and Halverson, respectively,

29

which limited <u>Packingham</u> only to situations where a criminal statute has restricted a parolee's Internet use. From our perspective, the restriction on R.K.'s free speech rights under our federal and state constitutions is the same regardless of the source of governmental restraint – statutory or regulatory supervised release condition – as other jurisdictions have recognized in <u>Manning</u> (C.D. Cal.), <u>Morger II</u> (Il. S. Ct.), <u>Maxson</u> (D. Md.), Mutter (W.Va.), <u>Jennings</u> (Ky. Ct. App.), and <u>Cutshall</u> (Iowa) following <u>Packingham</u>'s pronouncement. The bottom line is that R.K.'s violations of an unconstitutional CSL condition have resulted in criminal convictions and sanctions, such as jail time, despite the fact a criminal statute did not restrict his use of social media through the Internet.

Furthermore, as <u>Morger II</u> maintained, the <u>Packingham</u> Court had no reason to address the issue of parolees facing an Internet ban under a supervised release program since it was not the situation before the Court. 2019 IL 123643, ¶52. Thus, the <u>Morger II</u> Court reasoned:

> Federal courts limiting the reach of <u>Packingham</u> have focused on the second sentence of this paragraph—particularly the phrase, "even by persons who have completed their sentences"[11]—to find that the principles of <u>Packingham</u> do not apply to those still serving their sentences—a group the <u>Packingham</u> Court

---

[11] <u>Packingham</u>, 137 S. Ct. at 1737.

had no reason to address. Those courts ignore the last sentence—italicized <u>supra</u>—which refers to the reformative and rehabilitative aspects of access to social media.

However, those who are still serving their sentences are also "convicted criminals" who "might receive legitimate benefits" from social media as "they seek to reform and to pursue lawful and rewarding lives." [<u>Packingham</u>, 137 S. Ct. at 1737]. One has to ask how "reform" differs from "rehabilitation" and, if there is no difference, why foreclosure of access to social media inhibited a sex offender's "reform" and was unconstitutional, in <u>Packingham</u>, but [730 ILL. COMP. STAT. ANN. 5/5-6-3 (2018)] (a)(8.9)'s total ban on access for <u>all</u> sex offenders on probation <u>furthers</u> the goal of "rehabilitation," without "tailoring" as to substance or circumstance.

[<u>Morger II</u>, 2019 IL 123643, ¶¶ 52-53 (emphasis in original).]

Accordingly, we join in this reasoning to conclude <u>Packingham</u> is applicable to the Board's social networking ban – N.J.A.C. 10A:71-6.11(b)23, making the ban unconstitutionally overbroad because it completely denies access to R.K.'s ability to express himself in the protected forum of public debate through social networking.

31

In reaching this conclusion, we reject the Board's position that Packingham should not be applied retroactively to R.K.'s sentences.[12] Though neither the United States Supreme Court, nor any other court that we are aware of, has addressed the retroactivity of Packingham, we agree with R.K. that based on Montgomery v. Louisiana, 577 U.S. __, 136 S. Ct. 718 (2016), Packingham applies retroactively. The Montgomery Court held "when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule." 136 S. Ct. at 729. The social networking bans imposed on R.K. are substantive because they infringe upon his constitutional right to free speech. See Id. at 729-30 (holding "[s]ubstantive rules . . . set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose").

D.

The State defends the social networking ban by pointing to its "escape valve" provision, which allows the District Parole Supervisor to lift the ban

---

[12] The issue of retroactivity was raised sua sponte by this court, and the parties submitted post-argument supplemental briefs on the question.

when there is a legitimate reason for doing so. In our view, giving this authority to the supervisor is not sufficient to save the ban from constitutional fatality.

A statute is unconstitutional if it gives a public official such broad powers "that the exercise of constitutionally protected conduct depends on [the official's] own subjective views as to the propriety of the conduct[.]" Lashinsky, 81 N.J. at 16 (1979) (citation omitted). Likewise, "with laws that carry penal enforcement" such as a violation of a special parole condition, "enforcement should not be left open to broad interpretation nor to the personal view of any particular parole officer." Pazden, 374 N.J. Super. at 370. See also State v. Jamgochian, 196 N.J. 222, 246 (2008) (holding a parolee's use of the Internet should not be based on "more than the caprice of a parole officer"). Even though parolees don't enjoy the "full panoply of due process rights," we still "think it plain that a special condition of parole that cannot pass constitutional muster in the same strict sense that we demand of other statutes with penal consequences must fail." Pazden, 374 N.J. Super. at 370. Here, the parole officer should not be given the authority to make the ban constitutional when we have determined it is unconstitutional.

Prior to Packingham, when we decided in J.B. I the social networking ban was constitutional on its face, we deemed it appropriate for the Board and

individual parole officers to apply the escape valve provision to consider parolees' requests to access a particular social media website. 433 N.J. Super. at 344. We stressed that "in the abstract" they would not "respond to such requests rigidly or unfairly, or that it will ignore an offender's individual circumstances." Ibid. Hence, "this procedural avenue should be exhausted first, subject to the right of an offender to bring a future as-applied constitutional challenge if necessary." Ibid. However, in light of Packingham and its progeny noted above, we are now constrained to conclude the social networking ban is unconstitutional on its face. Consequently, the escape valve provision afforded to the Board and parole officers under the social networking ban does not relieve the ban of its unconstitutionality. Neither the Board nor its parole officers should be the gatekeeper to determine whether a person's, even a parolee's, constitutional free speech rights via access to social media should be unlocked.

V.

Given our conclusion the CSL social media ban is facially unconstitutional, we are not required to address R.K.'s contention that the ban is unconstitutional as applied to him. Nevertheless, it is important to stress that based upon our rulings in J.I., 228 N.J. at 204 and K.G. 458 N.J. Super. at 35,

we conclude the social media ban is unconstitutional as applied to R.K.'s sentences.

Both J.I. and K.G. held Internet bans are appropriate parole restrictions on sex offenders where they are specifically tailored to address the goal of protecting society, reducing recidivism, and rehabilitating defendant parolees. J.I. 228 N.J. at 210; K.G. 458 N.J. Super. at 13-14. Neither decision, however, addressed whether the statute or regulations upon which the bans were imposed were facially constitutional.

In J.I., the District Parole Supervisor imposed a complete ban on Internet access except for employment purposes on the parolee, a sex offender who sexually molested his three daughters between the ages of six to fourteen, because he previously violated his CSL by accessing pornography sites and possessing pornography. 288 N.J. at 210. The complete ban was imposed in accordance with N.J.S.A. 30:4-123.59(b)(2).[13] The parolee subsequently

---

[13] In addition, the member or board panel certifying parole release may impose . . . any of the following Internet access conditions:

> (a) Prohibit the person from accessing or using a computer or any other device with Internet capability

violated the conditions when accessing the Internet to view the websites of his

church and state-appointed therapist.  Id. at 211.  The Court did not have the

> without the prior written approval of the court, except the person may use a computer or any other device with Internet capability in connection with that person's employment or search for employment with the prior approval of the person's parole officer;
>
> (b) Require the person to submit to periodic unannounced examinations of the person's computer or any other device with Internet capability by a parole officer, law enforcement officer or assigned computer or information technology specialist, including the retrieval and copying of all data from the computer or device and any internal or external peripherals and removal of such information, equipment or device to conduct a more thorough inspection;
>
> (c) Require the person to submit to the installation on the person's computer or device with Internet capability, at the person's expense, one or more hardware or software systems to monitor the Internet use; and
>
> (d) Require the person to submit to any other appropriate restrictions concerning the person's use or access of a computer or any other device with Internet capability.
>
> [N.J.S.A. 30:4-123.59(b)(2).]

benefit of the United States Supreme Court's ruling in Packingham, which was pending at the time J.I. was issued. Id. at 226 n.6.

Realizing the Internet was a "basic need and one of the most meaningful ways to participate in the essentials of everyday life," the J.I. Court determined the complete Internet ban was not "reasonably tailored to advance the goals of rehabilitation or public safety." Id. at 220, 229. The Court further held: "Internet conditions should be tailored to the individual CSL offender, taking into account such factors as the underlying offense and any prior criminal history, whether the Internet was used as a tool to perpetrate the offense, the rehabilitative needs of the offender, and the imperative of public safety." Id. at 224. The Court reasoned the preferred way to satisfy those goals were by deploying unannounced inspections, device examinations, and monitoring software. Id. at 230.

In K.G., this court addressed the distinct challenges raised by four convicted sex offenders on Parole Supervision for Life (PSL) to restrictions on their use of the Internet. 458 N.J. Super. at 12. Being challenged were "regulations adopted after J.I. [to] establish new criteria and procedures for the imposition of a special condition restricting Internet access." Id. at 20. A District Parole Supervisor could restrict Internet access if:

1. There is a specific and articulable reason and a clear purpose for the imposition of the Internet access condition; and

2. The imposition of the Internet access condition will act as an aid to the offender's re-entry effort, will promote the rehabilitation of the offender, is deemed necessary to protect the public, or will reduce recidivism by the offender.

[N.J.A.C. 10A:72-14.1(b)(1) to (2).[14] ]

The new regulations also prohibited an offender from possessing or utilizing a computer or device with access to the Internet without approval of the District Parole Supervisor and allowed the Board to monitor an offender's computer or device through the use of monitoring software, mandatory password disclosure, and unannounced device inspections. Id. at 20-21 (citing N.J.A.C. 10A:72-14.1(c)(1)(i) to (iv)).

We rejected assertions that these monitoring restrictions "violate the protections from unreasonable searches contained in the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution[,]" and "rights to substantive due process and privacy under the Fourteenth Amendment of the United States Constitution and Article I,

---

[14]  Codifying N.J.S.A. 2C:43-6.4(f).

Paragraph I of the New Jersey Constitution." K.G., 458 N.J. Super. at 31. However, applying the factors in J.I., we determined the as-applied Internet bans against two of the sex offenders were illegal as arbitrary and unreasonable as overly restrictive and not tailored to achieve the goals of their respective parole supervision because they had not used the Internet to facilitate their underlying convictions. Id. at 13, 34-37, 44-46.

Led by these rulings, we conclude imposing the social networking restriction on R.K.'s CSL sentence in 2007, which later became the regulatory social networking ban in 2010, violates his constitutional rights of free speech because his sexual offense convictions of lewdness and endangering the welfare of a child resulting in his CSL sentence were not related to his use of a social networking website, or even the Internet at all. The State argues R.K.'s ban was related to his offenses to avoid recidivism, especially in light of his polygraph admission that he accessed Craigslist to solicit prostitutes. R.K.'s convictions, however, had nothing to do with, nor were they facilitated by, access to social media; thus, the conduct the Board seeks to eradicate is not addressed through the denial of R.K.'s constitutionally cherished right to participate in the contemporary forum of First Amendment free speech rights: social media. Because R.K.'s offenses involved minors, he was appropriately banned from

A-2022-18T2

contacting minors. A more limited social networking restriction directed at contacting minors may be more fitting. Consequently, the social media ban as applied to R.K. is more restrictive than it needs to be, thereby making his sentences for violating it, illegal.

Furthermore, the trial court's written decision suggests the ban on "sexually oriented material" prevented R.K. from accessing dating websites; finding R.K.'s conviction for violating his CSL condition is "fully justified by a particular term of [his] CSL separate and apart from the [social media ban]." Yet, the court made no specific findings of fact that Craigslist constituted a dating website. Even assuming Craigslist is a dating website, which a website for personal ads is arguably not, the ban on sexually oriented materials does not limit R.K. from finding dates with consenting adults. But even if we accept the proposition that R.K. was illegally soliciting prostitutes, based upon the record before us, such conduct does not fall within the limited condition prohibiting his access through the Internet to any "publication, . . . that contains a description or depiction of actual or simulated [sexual] acts" as defined in R.K.'s special CSL condition. Hence, R.K.'s conviction and sentence for accessing Craigslist is still illegal because he did not violate a proscribed CSL condition. Moreover,

A-2022-18T2

R.K. was not charged or convicted for soliciting a prostitute for his actions on Craigslist.

VI.

In sum, we fully appreciate the Board's obstacles in preventing recidivism of its sexual offender parolees, especially considering the ever-expanding services available on the Internet, which makes the Board's efforts more trying. Since our decision in J.B. I some mere seven years ago and the environment our Court encountered in J.I. three years ago, there is no doubt society's reliance on the Internet for news, information, social contact, and entertainment has increased tremendously due to its increased ease of access, speed, efficiency, and creative use.[15]  This was foreshadowed by the Packingham Court when it remarked, "[t]he forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow."  Packingham, 137 S. Ct. at 1736.

---

[15]  See Elisa Shearer, Social Media Outpaces Print Newspapers in the U.S. as a News Source, PEW RESEARCH (Dec. 10, 2018), https://www.pewresearch.org/fact-tank/2018/12/10/social-media-outpaces-print-newspapers-in-the-u-s-as-a-news-source/ (study showing statistics regarding where Americans "often" accessed news sources; social media was accessed 20%; print newspapers, 18%; and news websites, 33%).

As social networking has prospered through the Internet, we now apply Packingham's premonitions as instructive to our conclusion that the supervised release condition completely banning R.K.'s access to social networking violates his constitutionally protected free speech. We continue to stress that the Board's regulations must avoid blanket bans on such valued rights. Supervised release conditions must be specifically designed to address the goals of recidivism, rehabilitation, and public safety, which are specifically tied to the individual parolee's underlying offenses. Statutes and regulations must not afford parole supervisors and officers unlimited personal discretion to determine what conditions are constitutionally permissive.

Accordingly, we remand to the trial court to: (1) resentence R.K. and remove the 2007 CSL condition prohibiting him from accessing social networking on the Internet without the express authorization of the District Parole Supervisor, which the Board added to his June 2000 conviction for fourth-degree lewdness and third-degree endangering the welfare of a child; and (2) allow R.K. to withdraw his September 14, 2012 guilty plea for violating the probation terms of his CSL condition prohibiting social networking on the Internet without the express authorization of the District Parole Supervisor. We discern no basis to allow R.K. to withdraw his guilty plea to the offenses

42

underlying his June 2000 conviction. In addition, we do not preclude the trial court, or the Board, from imposing less restrictive conditions on R.K.'s Internet access that comport with the our federal and state constitutions.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2022-18T2